Freeman, J.,
delivered tbe opinion of the court:
This suit is brought to recover from the tax collector of Giles county, two dollars paid as a tax on two dogs, one by the agreed case is the property of Phillips, the other is a “stray dog’' of no value, which was on the plaintiffs premises, and harbored by plaintiff. The tax was paid under protest, and this suit brought, no doubt, for the purpose of testing the question of the constitutionality of the act of the legislature on this subject.
*236 The act of tlie legislature of March 22d, 1875 [Acts 1875, cli. 67], is as follows: Section 1. “That hereafter the keeping of dogs shall be a privilege, which shall be taxed as follows: Every owner or harborer of a dog or dogs shall pay one dollar on each dog; for the privilege of keeping a bitch the owner or harborer of the same shall pay a tax of five dollars for each bitch so kept except spayed bitches, which shall be taxed as other dogs, to be collected and paid into the treasury as other moneys by the revenue collector.”
Section 2 provides for the enumeration and assessment by the tax- assessor' of the dogs and bitches in their districts at the time he assesses other property, and that the revenue collector shall collect the taxes SO' assessed. Each person is requested to state on oath to the assessor the number and kind of dogs owned by himself.
The third section of the act makes it a misdemeanor to fail to pay the taxes so assessed within ten days after demand made by the tax collector or his deputy, and on conviction, he is to be fined not less than five dollars and costs for each dog or bitch not paid for, with a proviso that the party may be relieved from payment of the tax by immediately killing the dog upon demand made for the tax. These are all the provisions bearing on the question before us.
It might seem at first glance that this is a case of small importance, involving, as it does, but the paltry sum of two dollars, but upon consideration it will be readily seen that it involves not only large interest to the state, but also to the people who pay the tax. It is stated by the attorney-general that an assessment of $266,000 has been made on the dogs of the state, from which has already been derived to the treasury the sum of $120,000. These figures show the gravity of the questions presented in this aspect. In addition, the case presents several grave constitutional questions as to the powers of the legislature *237 that (to say the least of them) are not of ready solution. Constitutional questions in a republican form of government like ours, always demand grave consideration. Our constitutions, state and federal, embody the great guarantees for freedom of the citizen that have been wisely wrought out by the experience of ages past. Not only this, but they contain the limitations which the people have imposed upon their official agents, as well as upon themselves, through their representatives in our legislature, which cannot be disregarded. It is true as an axiom admitted everywhere by the courts of the United States, that the legislature of a state may exercise all legitimate powers appertaining to the government of a free people, representing, as it does, the sovereign will of such a people, except what is expressly, or by fair implication, forbiddén by the constitution of such state, yet limitations therein imposed must always be held as imperative, the supreme law of the land, which no legislature can disregard. If it should be done, then it is the duty of any or every court in the land to declare such act void as beyond the power of the legislature, and in violation of the embodied will of the people, as expressed in their constitution of governments. "With these views of the gravity of the questions before us, we proceed to their solution.
It is obvious from the sections we have quoted that this act must be treated as a revenue bill, one in which the legislature intended and has exercised the taxing power. The title of the act is, “An act to increase the revenue of the state, and to encourage wool growing,” thus indicating so far as this goes, two objects, the leading one, however, the increase of the revenue of the state. The body of the act shows the other object was deemed but an incident or probable result of the leading object of the enactment. The first section emphatically declares the keeping of dogs a privilege, and then proceeds to prescribe the amount of tax to be paid on this privilege, and the money should be *238 paid into the treasury as other revenue collected by the revenue collector.
In each of the sections it is spoken of as a tax, and the mode of payment provided for. It is true the fourth section provides for another and different end- — that is, the punishment of persons who knowingly keep sheep-killing dogs, but this does not and could not change the entire character and purpose of the main body of the act. This being the undoubted character of the law before us, the question is whether its provisions are in accord with the requirements of the constitution. If forbidden by that instrument, the enactment must be held void regardless of all other considerations. To this test, every act of the legislature must be brought when it is before our courts for interpretation or application.
"We need not say that it does not purport to be a tax on the dog as property, for in that case the rule of the constitution is plain, that “all property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state.” [Const., art. 2, sec. 28.] We have held that a dog was property in our state, and we must treat the case in this view. [See State v. Brown, 9 Bax., 53; Wheatley v. Harris, 4 Sneed, 468.] The tax is what it purports to be, a privilege tax — that is, a grant of a right of certain conditions to do' what is otherwise prohibited, and we must decide the question at present on that aspect of it.
The language is that hereafter the keeping of dogs shall be a privilege which shall be taxed as follows,' etc. In this view of the question, the real point presented is whether the simple ownership of property of any kind can be declared by the legislature a privilege, and taxed as' such, for if it can be done in the case of a dog it may be done in the case of a horse, or any other species of property. It is clear this is what is done by this statute, except that *239 it bas even gone further, and taxed a party wbo shall harbor or give shelter to a cqr on his premises. This latter privilege, we take it, is one that will not be much sought after. But to the main question.
It is evident the words, “keeping of dogs,” in the statute mean simply ownership, especially when taken in connection with the other provision making harboring them taxable, likewise showing definitely the purpose of the legislature to tax in the one case the ownership, in the other case a dog that was not owned but only harbored on the premises. We‘turn to the constitution, art. 2, sec. 28, for such limitations on the taxing power of the legislature as have been imposed by the people. After providing for uniformity and equality of taxation upon all property, according to its value, that value to be ascertained as the legislature may direct, it is provided: “But the legislature shall have power to tax merchants, peddlers, and privileges in such manner as they may from time to time direct.” It would seem clear that this was intended to fix definitely two different and distinct objects of taxation as well as modes. The first is property, which is to be taxed according to value. The second, merchants, peddlers, and privileges. These are different objects of taxation, evidently, and are to be taxed by a different rule — that is, in such manner as the legislature may direct. The ad valorem principle is excluded here and the manner of taxation left to the legislative will. It must be these two clauses have reference to different objects and prescribe for different subjects, or else the constitution has laid down a definite rule as to taxation of property in the first case, and then in the same clause has enabled and empowered the legislature to reject and utterly disregard that rule, by simply changing the name of the tax to a privilege tax, or tax on a privilege, and then taxing it in its own way, regardless of value. We take it, this is too clear to need further discussion.
*240 This being so, we inquire wbat is the peculiar element or elements in the latter class of objects of taxation distinguishing them from property, the subject of regulation contained in the first clause of the section. "W"e first take the language of the constitution, and then examine our decisions on the question for the solution of this question.
“Merchants, peddlers, and privileges/’ are the defined objects of taxation in the latter clause of the section. It is certain the merchant is not taxed except by reason of his occupation, and in order to follow or pursue this occupation — one of profit — in which it may be generally assumed capital, skill, labor, and talent are the elements of success, and are called into play by its pursuit. This pursuit or occupation is taxed, not as property, but as an occupation. Another element in this occupation is, that its object and pursuit is directed to a profit to be made oil the general public, the merchant having a relation, by reason of his occupation, to the whole community in which he may do business, by reason of which he reaps, or is assumed to reap, the larger profit by drawing upon or getting the benefit of the resources of those surrounding him. The same idea is involved in the case of the peddler, who may range over a whole county by virtue of his license. TIis is an occupation of like character, a peculiar use of his capital varied only in some of its incidents.
These occupations are taxed as such, and not on the ad valorem principle. So we take it the word privilege was intended to designate a larger, perhaps an indefinite class of objects, having the same or similar elements in them distinguishing them from property, and these objects were to be defined by the legislature and taxed in like manner as might be deemed proper. But the essential element distinguishing the two modes of taxation was intended to be kept up. That is the difference between property and occupation or business dealing with' and reaping profit from the general public, or peculiar and public uses of *241 property by wbicb a profit is derived from tbe community. If this distinction does not exist, then, as we bare said, tbe constitution bas fixed tbe rule of taxation with precision in tbe' first clause imperatively, and tbat it shall be acl valorem, and in tbe subsequent and secondary clause and class of objects of taxation, bave left tbe legislature free to utterly avoid tbe first by taxing tbe ownership of all property as a privilege. This cannot be the true interpretation of so solemn an instrument as tbe constitution of a state.
We now examine for a moment tbe leading cases decided by this court, to ascertain whether tbe principles we bave stated do not underlie them, and whether they do not really sustain tbe views expressed. There may be and is found sometimes in tbe loose use of language or generality of terms apparent conflict with these ideas, but when taken in connection with tbe cases in judgment, and limited to tbe facts before tbe court, we think there will be found no real conflict in any of tbe eases with tbe view we bave taken. Tbe case of Mabry v. Tarver, 1 Hum., 94, was under tbe act of 1835 [Acts 1835-6, cb. 13, sec. 4], prohibiting tbe keeping, or rather, using tbe jackass for profit in tbe propagation of stock. Here it is clear it was tbe keeping of tbe animal, and using him for profit to be derived from tbe public in a particular manner, tbat was declared to be a privilege and taxed as such. It is not a tax on tbe jack, or for owning him or harboring him as tbe case before us, but a tax upon tbe particular public use to wbicb be is put, tbat makes tbe element of privilege in tbat case. Judge Iieese, in bis opinion, keeps this idea steadily in bis mind, for be says it iá contended tbat this avocation is not in itself and its nature a privilege, and then goes on to say tbat it becomes one when declared by tbe legislature and forbidden to be exercised without license. He then replies to tbe argument tbat tbe legislature might declare farming a privilege and tax this class of *242 “pursuits and avocation,” by saying tbe danger was remote, and the remedy to be applied by the people in the exercise oí the elective franchise, and we may add no such danger can ever exist while we continue to be an agricultural people unless there should be a most imperative demand for it, and then the people would impose the privilege tax upon themselves through their representatives, and they may very safely be trusted not to tax themselves unnecessarily in this direction. But the point to be noticed is that the idea of a privilege in this case is attached to the avocation, the pursuit, and not the ownership simply of the land on which the avocation may be pursued. It would equally apply to the avocation, if followed on lands owned by another. The idea that the legislature should say that a man should not keep or own a farm without a license would be a reduction of the question at once to an absurdity. The citizen could at once point to' the constitution and say it was his property, of which he could not be deprived except by due process of law, and that he held it by right, and could not be .compelled to hold it by a license from any authority in the state, or from any department of its government.
The case of Cate v. The State, 3 Sneed, 121, arose under the same act of 1835, and the same idea runs through the case, the language used being less accurate and the reasoning less carefully expressed by Judge Caruthers, than in the case where the opinion was by Judge Reese. The State v. Schlier, 3 Heis., 283, was the case of a party engaged in the avocation of photographing. In this' case Chief Justice -Nicholson cites the definition given a privilege from various preceding cases, as follows:
“The exercise of an occupation or business which requires a license from some proper authority, designated by a general law, and not open to all, or any one, without such license,” and says this was the settled judicial construction of the term privilege at the date of the adoption *243 of our constitution in 1870, and in tbis sense tbe term was used in tbat instrument. .It is seen tbat tbe essential element of tbe definition is occupation and business, not tbe ownership simply of property, or its possession or keeping it. "We may concede, as we understand tbe argument of the attorney-general to do, tbat an actual license issued to tbe party is not an essential feature of a privilege, but is only tbe evidence of the grant of tbe right to follow the “occupation or pursuit,” and tbe usual and perhaps universal incident to such grant, or tbat a tax receipt is, or even may be tbe evidence of tbe grant. Still, tbe thing declared to be a privilege is tbe occupation, tbe license but tbe incident to its engagement, prescribed by statute, assuming, however, tbe license in one form or tbe other is to be bad. We think it would be impossible to bold, in any accurate sense, that a man could only be entitled to bold and possess bis property, paid for with bis money or earned by bis labor, upon tbe condition of obtaining a license, either from tbe county court clerk, or a tax collector. Iiis right is indefeasible under tbe constitution of the state. He can only be deprived of it by due process of law, or tbe law of tbe land as hereinafter explained. It is true bis property may be sold if be fails to pay bis taxes properly imposed, but this must be done under regular proceedings provided by law in such cases, and is in tbe nature of a sale'under execution for the payment of a debt. The case of French v. Baker, 4 Sneed, 395, the question as stated by Judge Carutbers, page 196, was whether tbe occupation of a wholesale grocer was a privilege subject to taxation. It was held that it was. It is true in tbis case we have language used somewhat wanting in precision, and tbe reasoning not precisely accurate in assuming tbe test of privilege to be a declaration of tbat fact by tbe legislature, or tbe requirements of a license as an essential element, but when we look to tbe case before the court, and limit, tbe generality of the *244 language to its facts, tlie same idea underlies this, as all the other cases in our state, that the tax is on the occupation, avocation, or calling, it being one in which a profit is supposed to be derived; by its exercise, from the general public. We need not go- through the list of cases in our state, on this question. It suffices to say that none of them vary the principles announced herein or found involved in the cases cited. When fairly construed in connection with their facts, all go on the idea of declaring the privilege to be in the exercise of the occupation, ‘or in allowing something to be" done, not in the enjoyment, possession, or ownership of property as such. We might gO' into a more elaborate discussion of this question, and meet the exceedingly able and acute argument of the attorney-general in detail, but we do not deem this necessary on this branch of the case, as it would swell this opinion beyond a reasonable length. -The principle we have announced, based, as we think, on the true meaning of the constitution as understood by its framers, as well as the expositions given by our courts from 1835 down to the present time, abundantly demonstrate the incorrectness of his positions. We need but add that to assume as correct his main proposition, that whatever the legislature shall so declare is a privilege, is to make this clause of the constitution as conferring a power, or limiting or defining a power in the legislature, useless, inoperative, and absurd. If the power conferred to tax in this mode is only equivalent to the will or discretion of the legislature, then the constitution, or this clause, is practically a nullity, ceases to be any rule, or to operate at all over the subject, but only the will' of the legislative body would be supreme over the question, so that, in fact, anything and all property could be taxed exclusively in this way, and thus the rule of taxation according to value be annulled. This cannot be the proper construction of the clause under consideration.
We are aware that .the distinction may be said to be *245 somewliat refined between taxing tbe occupation, avocation, or calling of a party by reason of bis using bis property in that calling or occupation, and taxing tbe property itself, as property, but tbe distinction is made in our constitution in very plain and emphatic language, repeatedly adopted as its proper interpretation by our courts, and we feel bound to maintain it as tbe. supreme law of tbe land, which we cannot alter and dare not disregard. In support of tbe view we have taken of this bill as a revenue measure in its purpose, we may add here that it is so treated by all the parties to .this case by paying tbe taxes, first, under protest, and second, bringing tbe suit for tbe amount so paid under tbe provisions of tbe act of 1813, and if these provisions bad not been strictly pursued, we have no' doubt but that tbe watchful attorney, who always sedulously and zealously guards tbe interest of tbe state, would have promptly interposed tbe bar of that statute against tbe right of tbe taxpayer to sue at all.
So much for tbis aspect of tbe case, in wbicb we bold this law by its terms to be a revenue, law, and a tax upon tbe simple ownership of property, by declaring it to be a privilege and not a tax upon any peculiar use of it for profit to be derived from tbe general public, nor a tax upon an avocation, calling, or pursuit,-all of wbicb may be declared and bave been so beld privileges under our constitution.
Tbe dog being property, may be taxed as a matter of course, under our view, as áll other property, ad valorem, such value to be ascertained in such manner as tbe legislature may direct. We omitted to notice tbe fact, and add it here, that tbe language of our statutes creating privileges, as well as tbeir subjects, is based on tbe view we bave taken. For instance, tbe code, sec. 550, says: “Tbe occupations and transactions tbat shall be deemed privileges, and be taxed, and not pursued or done without license, are tbe following, etc. [See Shannon’s Code, secs. *246 092, 712], then enumerating tbe various occupations, business, and callings that are made subject to tlie tax tbus imposed, all of them involving tbe elements, in whole or in part, we have given in this'opinion as the distinctive features of a privilege.
As to the objection that the dog is not a property of general use or having a market value, we may say that the particular use to which property may be put, or its value, or what may malee the elements of its value, cannot change or affect the principle on which it is protected as such by the constitution. If it be property, whatever may be its uses or elements of value, or however small that Value may be, it is still under the protection given by that instrument. Many articles might have no market value, yet no one would hesitate to claim they were not so protected, such as family pictures and many articles of like kind that might have no practical use and no' market value, and therefore, not be real sources of revenue, on the principle of ad valorem taxation.
We now proceed shortly to notice the other aspect in which this case has been pressed upon our attention by the attorney-general and counsel who argued the case— that is, that the law is sustainable under the police power of the state.
This power is a very different one from the taxing power, as we think, in its essential principles, though the taxing power, Avhen properly exercised, may indirectly tend to reach the end sought by the other in some cases. This power in the state is based on the maxims that a man must so use his own as not to do wrong to another, that the individual citizen shall so enjoy his own rights as not thereby to infringe upon the rights of others, that the interest and rights of the individual, or a class of individuals, is to be made subservient to the higher interest of the whole or majority of the people of the state whenever the minor interest shall conflict, in the judgment of the legis- *247 1 ature, with that of the greater. It is well defined by Chief Justice Shaw, in Commonwealth v. Alger, 7 Cushing, 53, 84, 85, to be a “principle growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it [may be so regulated that it] shall not be injurious to the equal [enjoyment of others having an equal] right to the enjoyment of their property, nor injurious to the rights of the community.Eights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment [as shall prevent them from being injurious and to such reasonable restraint and regulations], established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.” This was said in a case where parties had the right, by reason of ownership of -uplands near the sea, and to the fee in adjoining flats, to erect wharves and other buildings thereon. The legislature fixed lines in the harbor of Pos-ton, beyond which no wharf should extend, and declared any wharf extended beyond this point to- be a nuisance. The party was indicted, however, for the nuisance and the conviction sustained, and the law held to be constitutional.
¥e need not go minutely into the various cases on this question. They all stand on the principle announced, though the particular circumstances of each case are variant the one from the other. Instances of the exercise of this power may be found in regulations requiring railroads to fence in their tracks »to prevent destruction of stock, making them liable on failure for the value of all stock lulled by their cars. See Cooley Const. Limt., 572 et seq. [6th ed., 704, et seq.; 712 et seq.]
As said by Mr. Cooley, Const, Limt., 594 [6thed., 738, 739], “it would be quite impossible to enumerate all the instances in which the. power is, or may be exercised, be *248 cause the various cases in which the exercise by one individual, of his rights, may conflict with a similar exercise by others, or may be detrimental to the public order or safety, axe infinite in number and in variety.”
We will, however, from the cases before us, indicate some of the means which have bpen held constitutional and .within the power of the legislature in other states, by which the ownership of property may be regulated, and restraints fixed upon such ownership so as to prevent injury to others, or detriment to great public interests to which such ownership must always be held subordinate. Numerous instances will be found in Cooley’s Const. Limt, p. 595 [6th ed., 739 — '741], for the proper exercise of this power, and are familiar to our own jurisprudence. Such cases, too, as in themselves are not wrong, but axe declared to be public nuisances because endangering the public health, public safety, and we may add, the same principle applies to that which is deemed injurious to' any great public interest, and this to be judged of by the legislature. Mill dams may be abated or destroyed, church yards found detrimental to the public health, or in danger of becoming so, the keeping of gunpowder in cities or villages, the sale of poisonous drugs, allowing unmuzzled dogs to be at large when danger is apprehended from hydrophobia, and we may say, the same regulation might be applied in case of danger to any great public interest, such as sheep raising in our state. The author adds, “and, generally, it may be said that each state has complete authority to provide for the abatement of nuisances, whether they exist by the party’s fault or not.” "
In Massachusetts, it has been held that a law [Act of 1867, ch. 130, sec. 7], was valid providing “that any person may, and every police officer [and constable], shall kill, or cause to be killed, -all dogs [whenever or] wherever found, not licensed and collared according to the requirements of a statute, and this -without previous adjudication, *249 and that an officer with a warrant for this purpose from proper authority, might even enter upon the close of an owner for this purpose. See 100 Mass. B., 136. "We may say that this decision goes too far in one aspect, and there ought to be a judgment of a court of competent jurisdiction as to the improper possession of the property before it could rightfully be destroyed.
At any rate, from a brief summary of -their results, it is clear from them all that the state may declare the keeping of this species of property a nuisance, or limit the number to be kept, or particular species of it, with known tendencies to do injury by devouring sheep; that it may impose penalties for keeping such animals, to be enforced by fine or otherwise, on conviction; that it may regulate the manner in which such animals shall be kept, as by forbidding them to be allowed to go at large except when in use and under the control of competent persons, or require them to be kept muzzled or collared so as to be incapable of doing mischief, and, in fact, may make whatever [character] of regulation or requirement in this direction [that may be] adequate to the end to be attained, the protection of that valuable and increasing industry, wool growing in bur state.
To devise proper means in this direction is confided to the wisdom of the legislature representing the people and familiar with their wants. But in case of destruction of this or any other property, except in the well-known cases, recognized at common law, of greát emergencies, such as the destruction of a house in a city to check the progress of a fire, etc., and under these limitations, the rule of the constitution of our state must be followed — that is, no man shall be deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land. [Const., art. 1, secs. 8, 21, and art. 11, sec. 8.]
This last phrase is but equivalent to "due process of *250 law,” and is well defined in this respect by the supreme court of New York,'as follows:
“The law of the land, as used in the constitution, does not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense.” It would but be to say to the legislature, you shall not do- the wrong unless you choose to do it. The meaning is, that no member of the state shall be disfranchised or deprived of any of his right and privileges, unless the matter shall be adj adged against' him upon trial, had according to the course of the common law. It must be ascertained judicially that he has forfeited his. rights before he can be deprived of them. It cannot be done by mere legislation, but we add, only by adjudication, with the well-known exceptions referred to. Taylor v. Porter, 4 Hill, 140; Sedg. on Const. and Stat. Law, p. 478, et seep
It is proper to say that another section of the act, not germain, however, to the main body of it, contains an apt illustration of an appropriate exercise of this power, by making it a misdemeanor, knowingly to keep a sheep-killing dog, and upon conviction upon presentment or indictment, imposed a fine of twenty-five dollars on the person so convicted.
The act of 1865--G, ch. 3, sec. 1, had provided a similar remedy which was in force when the law under discussion was passed, but we suppose was not observed by the legislature at the time. See T. & S. Code, sec. _4665a [Shannon’s Code, sec. 6527].
It will readily be seen from this review of the principles that underlie the police power, as well as the cases on the subject, that this statute is not in accord with them, so far as the provisions for taxation are concerned. In fact the law was not framed with that view, but purely as a revenue measure, no doubt intending as one of the results, however, to be secondary to the first, to lessen the number of dogs *251 in this state, but this secondary end which might or might not be the result, cannot bring the tax imposed within the requirements of the constitution, and the means used are not the appropriate ones to that end.
It is proper, perhaps, before we close, to refer 'to one other argument presented. That is, that our license laws in some cases, as in that of selling spirituous liquors, were intended to check its sale. This may be, and is no' doubt, to some extent, a secondary result of the law, but the leading one [object] is revenue.
But it is clear, this is only an incident to such a law. ¥e have but to look at the list of occupations made privileges to see that this is not the general object of such laws. Por instance, merchants, telegraph companies, artists, and photographers. These occupations were certainly not intended to be checked or lessened by declaring them a privilege, and taxing them as such. It does not follow that because this effect may, in- some degree follow, that it is the end of the law, nor that it is done in the exercise of the police power of the state, especiallly when we see the leading object to be revenue. But we need not further pursue this discussion. The result is, that the law before us must be held void as a revenue measure or tax imposed in violation of the limitations of our constitution, and not sustainable under the police power of the state, because not so purposed in the first place, and, second, because not using the appropriate remedies for the exercise of such power. However lightly we may esteem the animal subject to this tax, the const!tuion of our state is not thus lightly to be esteemed, and must be held, both in great and small matters, to be the supreme law of the land.
Let the judgment be reversed, and proper judgment be entered here.