H. J. Darnell, et al., v. W. A. Shapard, Trustee, and John Graves, et al. v. Harvey Thorn, Trustee.*

(*Nashville.* December Term, 1927.)

Opinion filed March 17, 1928.

## 1. POLICE POWER. DOGS.

The regulation of the keeping of dogs is a matter within the police power of the State, and does not differ from the right of the State to regulate the handling of intoxicating liquor. (Post, p. 552.)

Citing: State v. Anderson, 144 Tenn. (17 Thomp.), 564; Ponder v. The State, 141 Tenn. (14 Thomp.), 481; State v. Erwin, 139 Tenn. (12 Thomp.), 341; State v. Rauscher, 69 Tenn. (1 Lea.), 96; State v. Frost, 103 Tenn. (19 Pick.), 685; Webster v. The State, 110 Tenn. (2 Cates), 491; Note, 8 L. R. A. (N. S.), 363; Note, 8 Ann. Cas. 258; Sec. 8, article 11, State Constitution.

## 2. POLICE POWER. LEGISLATION. BURDEN OF ATTACK.

One who assails classification made in a police act must carry the burden of showing that it does not rest upon any reasonable basis, but that such classification is essentially arbitrary. (Post, p. 553.)

Citing: Thomas v. State, 136 Tenn. (9 Thomp.), 47; City of Memphis v. State, ex rel., 133 Tenn. (6 Thomp.), 83; Motlow v. State, 125 Tenn. (17 Cates), 547.

## 3. POLICE POWER. LEGISLATION. CLASSIFICATION.

If any possible reason can be conceived to justify the classification, made in an act involving the police power of the State, it will be upheld and deemed reasonable. (Post, p. 553.)

Citing: Peters v. O'Brien, 152 Tenn. (25 Thomp.), 466; Hunter v. Conner, 152 Tenn. (25 Thomp.), 258; Caldwell & Co. v. Lea, 152 Tenn. (25 Thomp.), 48; Bank of Commerce & Trust Co. v. Senter,

149 Tenn. (22 Thomp.), 569; Ogilvie v. Hailey, 141 Tenn. (14 Thomp.), 392.

## 4. POLICE POWER. LEGISLATION. CLASSIFICATION. LEGISLATIVE INTENT.

The decision of the Legislature as to what is a sufficient reason to justify a classification contained in an act involving the police power will not be reviewed by the courts unless it is palpably arbitrary, even though such reason is not disclosed in the face of the Act. (Post, p. 553.)

Citing: State ex rel. v. Schlitz Brewing Co., 104 Tenn. (20 Pick.), 715; State ex rel. v. Condon, 108 Tenn. (24 Pick.), 82; State v. McKay, 137 Tenn. (10 Thomp.), 280; Sullivan v. The State, 136 Tenn. (9 Thomp.), 194.

## 5. POLICE REGULATION. CLASSIFICATION. LEGISLATIVE DISCRETION.

The courts will not interfere if the Legislature deems that, as to one county of the State, the better policy is to discourage grazing and to encourage agricultural development thereof, or to encourage the raising of sheep in any such county. (Post, p. 554.)

Citing: Sullivan v. The State, 136 Tenn. (9 Thomp.), 194.

## 6. POLICE REGULATION. CLASSIFICATION.

The bare circumstance that persons or things excluded from a class possess some characteristics of persons or things included therein does not invalidate the legislation, (that is the mere fact that certain counties of the State in which sheep might be profitably raised, are left without the protection of a dog law), does not invalidate the legislation. (Post, p. 555.)

Citing: Memphis v. State ex rel., 133 Tenn. (6 Thomp.), 83; Condon v. Maloney, 108 Tenn. (24 Pick.), 82.

## 7. LEGISLATIVE ACT. PROTECTION OF SHEEP. STOCK LAWS.

An Act of the Legislature which tends toward the protection of sheep is in a measure a stock law, and such laws when applying to one county have been held valid. (Post, p. 556.)

Citing: Murphy v. The State, 114 Tenn. (6 Cates), 531; Hall v. State, 124 Tenn. (16 Cates), 235; Thomas v. The State, 136 Tenn. (9 Thomp.), 47; Sullivan v. The State, 136 Tenn. (9 Thomp.), 194; Ponder v. The State, 141 Tenn. (14 Thomp.), 481.

8. LEGISLATIVE ACTS. SPECIAL LAWS. FEDERAL CLASSIFICATION.

In a Special Act of the Legislature where the class identification by population is in such narrow limits, it is difficult to regard such an Act as a general law on the theory that other counties of the State may come within the class named, such a thing not being within human probabilities or reasonable expectations. (Post, p. 557.)

Citing: State ex rel. v. Trotter, 153 Tenn. (26 Thomp.), 30.

9. LEGISLATIVE ACTS. SPECIAL ACTS. CLASSIFICATION. REASON.

A difference in population of one county or city of the State and that of others is not the only justification for a legislative distinction between them. One good reason will serve as well as another. Post, p. 557.)

Citing: Sullivan v. The State, 136 Tenn. (9 Thomp.), 194; Condon v. Maloney, 108 Tenn. (24 Pick.), 82; Edmondson v. Board of Education, 108 Tenn. (24 Pick.), 557.

10. LEGISLATIVE ACTS. STOCK LAW. JUSTIFICATION.

The justification of stock laws rests on local conditions and necessities, and the Court will be very slow to set aside a legislative classification of counties and to declare that no reason can be conceived for omitting or embracing particular counties from the operation of such an act. (Post, p. 559.

11. POLICE POWER. DOGS.

The regulation of the keeping of dogs is a matter within the police power of the State, and does not differ from the right of the State to regulate the handling of intoxicating liquor. (Post, p. 559.)

Citing: State v. Anderson, 144 Tenn. (17 Thomp.), 564; Ponder v. The State, 141 Tenn. (14 Thomp.), 481; State v. Erwin, 139

Tenn. (12 Thomp.), 341; State v. Rauscher, 69 Tenn. (1 Lea.), 96; State v. Frost, 103 Tenn. (19 Pick.), 685; Webster v. The State, 110 Tenn. (2 Cates), 491; Note, 8 L. R. A. (N. S.), 363; Note, 'Ann. Cas. 258; Sec. 8, article 11, State Constitution.

12. SPECIAL LEGISLATION. STOCK LAW. CONSTITUTIONAL LAW.

An Act of the Legislature regulating the ownership of dogs and providing for its enforcement by the State Fish & Game Warden does not violate the Constitution, even though it applies only to certain counties named therein. (Post, p. 560.)

Citing: Private Acts 1927, chapter 202; sec. 8, article 1, sec. 8, article 11, Tennessee Constitution.

13. DOGS. POLICE REGULATION. PENALTY. CONSTITUTIONAL LAW.

An Act of the Legislature which provides for the summary destruction of dogs kept in violation of law, no matter how stringent in character, nor how summary the proceedings, are entirely within legislative power, and free from constitutional objection, though the property of the owner is destroyed without notice or hearing in the execution of the law. (Post, p. 562.)

Citing: 3 C. J., 154; 1 R. C. L., 1128; Cooley's Constitutional Limitation, 8th Ed., Note 3, page 1322.

State Constitution, article 11, sec. 8.

14. DOG LAW. POLICE MEASURE. REVENUE MEASURE.

A dog law passed as a revenue measure has been held unconstitutional. (Post, p. 564.)

Citing: State Constitution, sec. 28, article 2; Phillips v. Lewis, 3 Shan. Cas., 230; State v. Erwin, 139 Tenn. (12 Thomp.), 341.

15. DOG LAW. DAMAGES. JUSTICE OF THE PEACE. APPEAL. BOND. PAUPER'S OATH.

Under the provisions of the Dog Law which provides that a Justice of the Peace "shall issue a warrant requiring the owner, or the person having such dog in his charge, if known, to appear before such Justice of the Peace at a time and place named therein, at which time evidence shall be heard, and if it shall appear that such

dog is a sheep killer . . . the dog shall be immediately ordered killed. . . . Any person aggrieved at such order and claiming to be the owner of such dog or dogs may appeal to the Circuit Court within two whole days by giving bond equal to the value of the dog as determined by the Justice of the Peace." An appeal may be taken upon such owner taking the oath prescribed by our statute for poor persons. (Post, p. 564.)

Citing: Private Acts 1927, chapter 702, sec. 6; Thompson-Shannon's Code, secs. 5153, 4928; Scott v. Brandon, 125 Tenn. (17 Cates), 314.

### 16. DOG LAW. DAMAGES. APPRAISAL. CONSTITUTIONAL LAW.

A provision of the Dog Law requiring the County Trustee to appoint two disinterested citizens to appraise the damage to stock, for which damage it is proposed to make claim for payment out of a fund accruing under the statute does not contravene the Constitution. (Post, p. 565.)

Citing: Private Acts 1927, chapter 2; Staples v. Brown, 113 Tenn. (5 Cates), 639; City of Nashville v. Martin, 156 Tenn. (3 Smith), —.

### 17. DOG LAW. LEGISLATIVE ACTS. CONSTITUTIONAL LAW.

An Act of the Legislature regulating the ownership of dogs, providing for the destruction of vicious dogs, and compensation to the owner of stock killed by such dogs, is not beyond the scope of the title thereto contrary to the provisions of our Constitution. (Post, p. 565.)

Citing: Private Acts 1927, chapter 702; Tennessee Constitution, sec. 17, article 2.

### 18. PRIVATE ACTS. RIGHTS OF PARTIES.

Parties to a suit, involving the constitutionality of a special statute applying to four counties, who reside in either one of said counties can have no standing to ask the court to consider the rights of those residing in an adjoining county not affected by the statute, they not being adversely affected. (Post, p. 565.)

19. GENERAL DOG LAW. SPECIAL DOG LAW. CONSTRUC-
TION OF COURT.

. A dog law applying to the whole State having been held valid
by this court the matter will not be reopened in a case involving
a special act on the same subject. (Post, p. 566.)

Citing: State v. Anderson, 144 Tenn. (17 Thomp.), 564.

---

*Headnotes 1. Animals, 3 C. J., section 24; 2. Statutes, 36 Cyc., p. 1006;
3. Constitutional Law, 12 C. J., section 221; 4. Statutes, 36 Cyc., p. 993;
5. Constitutional Law, 12 C. J., section 222; 6. ———; 7. Animals,
3 C. J., section 580; 8. Constituaional Law, 12 C. J., section 1099; 9.
Animals, 3 C. J., section 495; 10. Time, 38 Cyc., 328; 11. Appeal and
Error, 3 C. J., section 1165; 12. Animals, 3 C. J., section 538; 13. Stat-
utes, 36 Cyc., p. 1044.

---

### FROM BEDFORD AND WILSON.

---

Darnell-Shapard case appealed from Chancery Court of
Bedford County.—HON. THOS. B. LYTLE, Chancellor.

Graves v. Thorn case appealed from Chancery Court
of Wilson County.—HON. J. W. STOUT, Chancellor.

W. H. CROWELL and E. C. PARKER, for Darnell, *et als.*

ROBERTS, McCARLEY & ROBERTS. and W. F. BARRY, JR.,
Assistant Attorney-General, for Shapard, Trustee, *et al.*

W. S. FAULKER, for Graves.

T. G. HENSON and ROBERTS & ROBERTS, for Thorn, Trus-
tee.

MR. CHIEF JUSTICE GREEN delivered the opinion of the
Court.

JUDGE W. L. COOK, dissenting—opinion here published.

These suits were brought to enjoin enforcement of
Chapter 702 of the Private Acts of 1927 on the theory

that this enactment was unconstitutional and void. Both Chancellors upheld the validity of the Act and the complainants in each case appealed to this Court. The cases were submitted separately to this Court but as the chief questions raised are common to both, they may be disposed of in one opinion.

Chapter 702 of the Private Acts of 1927 is an Act to regulate the keeping of dogs in the Counties of Bedford, Maury, Montgomery and Wilson, the counties being designated by name in the Act.

It is provided that every person owning or keeping a male dog shall pay a license fee of $1 and every person owning a female dog shall pay a license fee of $3 on or before June first of each year, to the County Trustee. That any person owning a kennel shall pay a license fee of $10 upon twelve dogs or less, or a license fee of $15 upon more than twelve dogs, such dogs to be at all times confined unless accompanied by the owner or his agent, or unless on chase or returning from chase. It is made the duty of the County Trustee to record the name of each person paying a license fee, with the date and amount of such payment and whether the same is a kennel license fee or a dog license fee, together with the description and sex of each dog on which the license fee is paid, and the license tag number issued for such dog. The trustee is required to issue to the dog owner a metal license tag, numbered and bearing the year for which the license fee is paid. This tag is to be attached by the dog owner to a collar which shall be worn at all times by the dog except that the collar may be removed from hunting dogs while on chase or returning from chase. Supervision of the Act is imposed upon the Department of Agriculture, Division of Game and Fish.

The County Trustee is required to make monthly reports to this Department and Division showing a list of names of all persons who have paid the license fee and the amounts collected and disbursed by the Trustee under the provisions of the Act. The Trustee is to remit to the said Department and Division twenty-five per cent of the gross amount collected by him, which sum shall be used by said Department and Division to defray expenses incident to enforcement of the Act. The Trustee is allowed to retain fifteen per cent of the amount thus collected by way of his compensation and the balance of the fund collected from this source is to be held by the Trustee in a fund known as the "Dog License Fund."

It is made a misdemeanor for any person to own, keep or harbor a dog upon which the license fee has not been paid or to permit a dog to run at large without wearing a tag, except as otherwise provided by the Act. It is made the duty of the State Game and Fish Warden and his deputies to look after the enforcement of the Act and to cause the arrest and prosecution of persons violating the provisions of the Act, and upon conviction of any such person under the said Act, one-half the fine imposed and collected is to be paid to such Game and Fish Warden.

Section 6 of the Act outlines procedure with reference to the destruction of unlicensed dogs and dogs committing depredations. As a special attack is made on the provisions of Section 6, it will be set out in full hereafter.

Provision is made for the compensation of the owner of any stock, fowl or animal killed or injured by a dog out of the "Dog License Fund" by Section 7. Under Section 8, the County Trustee upon complaint made to him by the owner of stock, fowl or animal injured by a

dog, is required to designate two disinterested citizens to appraise said damage and make a written report thereof to the Trustee. On receipt of said report the Trustee is required to make payment thereof out of the "Dog License Fund," and in case the claims certified exceed the amount of the fund on hand at any time, such claims shall be paid in the order of their certification. Provision is made by Section 9 of the Act for the compensation out of said "Dog License Fund" of those bitten by a rabid dog for the expense of necessary medical treatment.

By other Sections of the Act it is made a misdemeanor for the County Trustee to fail or refuse to perform the duties required of him in this connection, and the grand jury is given inquisitorial power in respect to violations of the Act, and Judges of Court exercising criminal jurisdiction are required to give in charge to their grand juries the provisions of the Act.

As heretofore stated, this Act in terms applies only to the Counties of Bedford, Maury, Montgomery and Wilson, and it is insisted that the Act accordingly undertakes an arbitrary and unjustified classification of these four Counties of the State and consequently violates Section 8 of Article I, and Section 8 of Article 11 of the Constitution. This objection to the Act has given the Court the gravest concern.

(1) The regulation of the keeping of dogs is a matter within the police power of the State. *State* v. *Anderson,* 144 Tenn., 564; *Ponder* v. *The State,* 141 Tenn., 481; *State* v. *Erwin,* 139 Tenn., 341.

The determination of the validity of acts of the Legislature attempting a classification of the counties of the State is largely influenced by the character of the legislation. If an Act of the Legislature affects particular

counties as governmental or political agencies it is good. It is good if it affects only one County in this capacity. No argument is required to sustain such an Act. If, however, an Act of the Legislature primarily affects the citizens of particular counties or of one county in their individual relations, then such classification must rest on a reasonable basis, and if the classification is arbitrary, the Act is bad. *State ex rel.* v. *Knox County,* 154 Tenn., 583; *State ex rel.* v. *Trotter,* 153 Tenn., 30; *Wilson* v. *Wilson,* 134 Tenn., 697; *State* v. *Columbia, etc., Turnpike Co.,* 133 Tenn., 40; *Redistricting Cases,* 111 Tenn., 234.

*(2)* One who assails classification made in a police measure must carry the burden of showing that it does not rest upon any reasonable basis, but that such classification is essentially arbitrary. *Thomas* v. *State,* 136 Tenn., 47; *City of Memphis* v. *State ex rel.* 133 Tenn., 83; *Motlow* v. *The State,* 125 Tenn., 547.

*(3)* If any possible reason can be conceived to justify such classification, it will be upheld and deemed reasonable. *Peters* v. *O'Brien,* 152 Tenn., 466; *Hunter* v. *Conner,* 152 Tenn., 258; *Caldwell & Co.* v. *Lea,* 152 Tenn., 48; *Bank of Commerce & Trust Co.* v. *Senter,* 149 Tenn., 569; *Ogilvie* v. *Hailey,* 141 Tenn., 392.

*(4)* The decision of the Legislature as to what is a sufficient reason to justify a classification will not be reviewed by the Courts unless it is palpably arbitrary. *State ex rel.* v. *Schlitz Brewing Co.,* 104 Tenn., 715.

"And it does not follow, because the reason for the classification is not disclosed in the face of the Act, that it is necessarily without reason and capricious. Reasons eminently wise and provident might control the law-making body, which do not appear upon the face of a statute, and for the Courts to strike it down, because not readily

perceptible, might well be criticised as an act of judicial usurpation." *Condon* v. *Maloney* and *State ex rel.* v. *Condon,* 108 Tenn., 82.

To the same effect see *State* v. *McKay,* 137 Tenn., 280, and *Sullivan* v. *State,* 136 Tenn., 194.

· Bearing in mind the principles set out, all of which are firmly embedded in our cases, we are unable to conclude that the segregation of the four counties mentioned for this legislation is palpably arbitrary and without possible justification.

It is well known that the prevalence of dogs in any community is a particular menace to the raising of sheep and involves that enterprise in great hazard. It may be supposed that in the four counties named the sheep industry has attained great proportions, that an especially large investment of money has been made by the citizens of these counties in such animals, that the prosperity of such counties is peculiarly dependent upon the sheep business, and that such counties are distinctively adapted to sheep. For reasons of this kind the Legislature might reasonably have concluded it wise to confer upon the four counties the protection of the Act before us, and at the same time the Legislature might reasonably have concluded that the operation of the Act in other counties of the State not so well adapted to sheep raising and where that industry was not developed, would be burdensome and of slight benefit.

(5) It may be supposed further that the Legislature, in the interest of diversified farming and the prosperity of the State as a whole as well as individual counties, thought that the welfare of the people would not be promoted by encouraging the raising of sheep in all the counties of the State. In *Sullivan* v. *The State,* 136

Tenn., 194, an Act of the Legislature was upheld which made it unlawful for the owner of hogs, sheep or goats to permit such animals to run at large in Rhea County. Proof was introduced showing that the counties adjoining Rhea County contained large boundaries of uncultivated, unfenced land suitable for grazing, and it was urged that one of those counties could not be validly set apart from the others and its citizens alone subjected to the burdens and benefits of such a Statute. The Act was upheld, however, and one reason for that result was the idea that the Court would not interfere "if the Legislature deems that as to one of such counties the better policy is to discourage grazing and to encourage agricultural development thereof."

It may again be supposed that other counties of the State, devoted to sheep raising, are already protected by special laws applicable to such counties alone. This is indeed true as to several other counties.

So without multiplying illustrations, it is obvious that possible reasons justifying the classification attempted in the Act under consideration are readily conceivable and that such classification is not hopelessly capricious.

(6) The mere fact, if it be a fact, that other counties of the State in which sheep might be profitably raised, are left without the protection of a dog law is no reason for striking down the law protecting Bedford, Maury, Montgomery and Wilson Counties. Any classification in legislation involves practical inequalities and the reasonableness of a classification does not depend on scientific or marked differences in persons or things or in their relations. The bare circumstance that persons or things excluded from a class possess some characteristics of persons or things included therein does not invalidate the

legislation. *City of Memphis* v. *State ex rel.*, 133 Tenn., 83; *Condon* v. *Maloney,* 108 Tenn., 82.

*(7)* Chapter 702 of the Private Acts of 1927 is in a measure a stock law. It especially tends toward the protection of sheep. There is nothing new about special stock laws in Tennessee.

In *Murphy* v. *The State,* 114 Tenn., 531, an Act of the Legislature was under consideration which prohibited the running at large of hogs, sheep and goats in counties of not less than 25,000 and not more than 25,100 population according to the Federal Census of 1900 or any subsequent Federal Census. This Act was applicable to Robertson County alone and was sustained as valid by this Court.

In *Hall* v. *State,* 124 Tenn., 235, a similar stock law with reference to counties of not less than 35,000 nor more than 35,250 population, according to the current Federal Census and any subsequent Federal Census, applicable to Montgomery County alone, was held good.

In *Thomas* v. *The State,* 136 Tenn., 47, a stock law as to counties of not less than 13,500 nor more than 13,640 population according to the Census of 1900 or any subsequent Federal Census, applicable to Loudon County alone, was sustained.

In *Sullivan* v. *The State,* 136 Tenn., 194, a stock law as to counties of not less than 14,200 nor more than 15,000 population by the current or any subsequent Census, applicable to Rhea County alone, was upheld.

In *Ponder* v. *The State,* 141 Tenn., 481, a dog law, in many respects like the one before us, for counties of not less than 29,946 nor more than 29,975 population by the Census of 1910 or any subsequent Federal Census, applicable to Obion County alone, was held good.

*(8)* The difference between the Acts just referred to
. and the one here under attack is that the counties cov-
ered by those Acts were designated by reference to the
Federal Census, and in this Act the counties are desig-
nated by name. Where the class identified by population
is in such narrow limits, where the difference between the
maximum population and the minimum population speci-
fied is 29 or even 800, as in one of the cases, it is difficult
to regard one of these Acts as a general law on the theory
that other counties of the State may come into the
class named. Such a thing is not within human proba-
bilities or reasonable expectations. *State ex rel.* v. *Trot-
ter,* 153 Tenn., 30. Nor is it less difficult to say, regard-
ing these as  special Acts, that there is any such sub-
stantial difference in the population of the included coun-
ty and many of the excluded counties as would furnish
a rational basis for diversity of laws.

*(9)* A difference in the population of one county or
city of the State and that of others is not the only jus-
tification for a legislative distinction between them. One
good reason will serve as well as another.

Thus in *Sullivan* v. *The State, supra,* as heretofore
shown, the Court sustained the classification on a ground
other than the population basis.

In *Condon* v. *Maloney, supra,* upholding the special
road law for Knox County, the Court exculpated the ap-
parent preference of Knox County over other populous
counties because it might then have been said (1901) ''as
to Davidson that the Legislature may have found as a
reason for its exclusion that it was covered by turnpikes
built and controlled by private chartered companies, and
in the matter of Shelby, that the public has already per-

fected a network of good roads, under a system entirely satisfactory.''

So in *Edmondson* v. *Board of Education,* 108 Tenn., 557, the Court considered Chapter 59 of the Acts of 1899 providing that for a term of five years thereafter, children of common school age and residing within a half mile of the limits of the city of Memphis, as extended by a previous Act of the same session, should have the right to attend, free of tuition, the public schools inside the city nearest to their places of residence. It was urged that this was an unreasonable burden, not common to other cities, placed upon the city of Memphis or the Board of Education of that city in violation of Section 8 of Article 11 of the Constitution. It was, however, said:

''But the statute, we think, in no sense can be characterized as capricious or unreasonable. Evidently the Legislature, realizing the great extension of the city's limits, as provided for by the Act passed a few days before, would likely throw into confusion the outlying school districts, and work inconvenience, if not loss, to the patrons of the public schools, where these patrons were left outside the new limits, and the schoolhouses, which they had contributed to erect and maintain, and to which they had been sending their children, might fall on the inside of the city limits by this Act, sought to reduce the loss and inconvenience for a limited period. In our opinion, it is altogether proper that this should have been done.'' *Edmondson* v. *Board of Education,* 108 Tenn., 557.

Other instances might be taken from our cases but it is perhaps sufficient to repeat the rule, heretofore quoted, that a legislative classification in statutes of this character will be confirmed if any reason can be found upon which to place it.

*(10)* It seems to us that the justification of stock laws rests on local conditions and necessities; that they are essentially special in their proper application; not naturally suitable to the State at large, to urban and rural territory alike, to this County and that County indifferently. Respecting such laws the Court will be very slow to set aside a legislative classification of counties and to declare that no reason can be conceived for omitting or embracing particular counties from the operation of such enactments.

*(11)* As is shown by our cases, *State* v. *Anderson, supra, Ponder* v. *The State, supra, State* v. *Erwin, supra,* the control of property in dogs is entirely within the police power of the State owing to the tendency of such animals to revert to their savage state and become a public menace and their susceptibility to rabies. The right of the State to regulate the keeping of dogs does not differ from its right to regulate the handling of intoxicating liquors.

Prior to the adoption of the Eighteenth Amendment to the Federal Constitution and National prohibition, local liquor laws were every where sustained and in all the States of the Union where liquor was legally sold, there was dry territory and wet territory. These discriminations between localities within the same State were quite usually sustained against attacks based upon constitutional provisions similar to Section 8 of Article 1, and Section 8 of Article 11 of the Tennessee Constitution. The state of the law was this:

"The decisions very generally unite in holding that any law for the control of the liquor traffic, which applies equally to all the persons in a locality, is constitutional and the State may make that locality of what ever

character it wishes; it does not matter whether it is a regular political division of the State or a municipal corporation or a district fixed arbitrarily by the law." Note, 8 L. R. A. (N. S.) 363, where many cases are collected. See, also, Note 8, Anno. Cas. 258.

The reported decisions of this Court had not gone quite so far as those of some states in upholding discriminations between localities in liquor laws, but the tendency was that way and this Court would doubtless have aligned itself with the others had the occasion arisen. *State* v. *Rauscher,* 69 Tenn. (1 Lea), 96; *State* v. *Frost,* 103 Tenn., 685; *Webster* v. *The State,* 110 Tenn., 491.

*(12)* We are of opinion, therefore, that Chapter 702 of the Private Acts of 1927 does not contravene the provisions of Section 8 of Article 1, and Section 8, of Article 11 of the Tennessee Constitution. The Statute makes a reasonable classification of the counties to which it applies, when the nature of the subject dealt with is considered. This conclusion is fully supported by the liquor cases and stock law cases to which reference has been made.

Several constitutional objections are made to Section 6 of the Act, as heretofore noted. This Section is as follows:

"Section 6. Be it further enacted, That it shall be the duty of the State Game and Fish Warden, all deputy game and fish wardens, and all *ex officio* Game and Fish Wardens, or the privilege of any person who may find or know of a dog roaming at large at any time of the year without a license tag as herein provided, to immediately notify the owner thereof, if known to him, and if such dog be again found roaming at large contrary to the provisions of this Act, or if upon the first occasion of find-

ing such dog so at large, the owner be not known to the warden, or if any dog, whether wearing a tag or not, be found killing, injuring or chasing sheep, or killing or injuring any domestic animal or fowl, it shall be the duty of the Warden to kill such dog forthwith in any manner he may see fit, and any person who shall find a dog worrying or killing sheep, or committing any of the depredations mentioned in this Section, shall have the right to kill such a dog on sight. If any Warden or other person shall not find a dog killing sheep or committing any of the depredations mentioned in this Section, but have reason to believe that such dog is worrying or killing sheep or committing any of the depredations mentioned in this Section, he shall apply to a Justice of the Peace of the County, City or Town wherein such dog may be, who shall issue a warrant requiring the owner, or the person having such dog in his charge, if known, to appear before such Justice of the Peace at a time and place named therein, at which time evidence shall be heard, and if it shall appear that such dog is a sheep killer, or has committed any of the depredations mentioned in this Section, the dog shall be immediately ordered to be killed, which the Warden, or the officer designated by the Justice of the Peace shall do. Any person aggrieved at such order and claiming to be the owner of the dog or dogs may appeal to the Circuit Court within two whole days by giving bond equal to the value of the dog or dogs as determined by the Justice of the Peace, and in the Circuit Court the trial shall be *de novo* and the Circuit Court shall have the power to enter the same order as the Justice of the Peace, directing the immediate killing of the dog. If any dog be running at large on which license has not been paid, and has no known ownership,

it shall be the duty of the Game Warden to kill such dog on sight. Any Warden failing or refusing to perform any duty herein directed to be performed by him shall be deemed guilty of a misdemeanor, and upon conviction thereof, he shall be fined not less than five dollars nor more than twenty dollars for each offense or dereliction of duty.

"The State Game Warden or any Deputy Game and Fish Warden or any *ex officio* Game and Fish Warden shall  receive a fee of two dollars and fifty cents, to be paid out of the fund derived from the sale of dog license tags for each dog killed by them under the provisions of this Act.  Bills for such fees shall be rendered by each Game Warden entitled to receive them to the County Trustee, who shall pay same when such bill shall have been verified by the oath of the officer presenting the same that the account is correct."

(13)  It is said that a dog is property and that the provision declaring it the duty of the State Game and Fish Warden and his deputies and the privilege of any person to kill a dog roaming at large not wearing a license tag, after notice to the owner of a previous roaming at large by said animal, or to kill such a dog upon the first occasion of finding it roaming at large without a tag, the owner not being known, authorizes a taking or destruction of property in violation of the law of the land and without due process, contrary to Section 8 of Article 1 of the Tennessee Constitution and to the Fourteenth Amendment to the Constitution of the United States.  It is urged that no man may thus be deprived of his property without notice and a hearing.

This contention has been considered and rejected by every American Court called upon to test a dog law such

as the one before us, with one or two exceptions. Section 6 of the Act before us is not so drastic as provisions to be found in some dog laws that have been upheld. There is very little conflict of decision as to this question. The result of the cases is thus stated:

"Where provision is made for the summary destruction of dogs kept in violation of law, it is held with great unanimity by the courts that such regulations, no matter how stringent in character, nor how summary the proceedings, are entirely within legislative power, and free from constitutional objection, though the property of the owner is destroyed without notice or hearing in the execution of the law. Thus the courts have declared to be valid statutes and ordinances providing that all dogs shall be licensed, registered, etc., and that any dog found at large in violation of such requirement may be killed by any police officer, or other person, and where an officer is empowered to kill an unlicensed dog, 'whenever and wherever found,' he is not guilty of trespass if he peaceably enters the owner's house for that purpose." 1 R. C. L., 1128.

The law is stated the same way in 3 Corpus Juris, 154, and in Cooley's Constitutional Limitations, 8 Ed., Note 3, Page 1322.

The reasoning of the cases is that dogs are so dangerous in their tendencies that such property is held subject to the strictest police regulation; that in the interest of public safety one is not entitled to own such property except on conditions prescribed by the Legislature; and for the prevention of injury to the rights of others, it is competent for the Legislature to authorize the summary destruction of such property if not held as required by law.

*(14)* There are some expressions in the opinion of Judge Freeman in *Phillips* v. *Lewis,* 3 Shan. Cas., 230, contrary to the foregoing, but these are *dicta* purely, uttered long since, before the law on this subject had so fully developed. The dog law under consideration in *Phillips* v. *Lewis, supra,* was treated as a revenue measure and for that reason held unconstitutional as in violation of Section 28 of Article 2 of the Constitution. This is pointed out in *State* v. *Erwin,* 139 Tenn., 341.

*(15)* By way of construction it may be said that the provision in Section 6 authorizing the owner of a dog aggrieved at the decision of a Justice of the Peace, before whom proceedings against such dog have been brought, to appeal to the Circuit Court within two whole days obviously means two whole days after the judgment has been rendered, just as an appeal is taken in other cases tried before a magistrate.

Likewise the provision that this appeal may be taken by giving bond equal to the value of the dog, etc., is to be construed like the provision of Section 5153, Thompson-Shannon's Code, authorizing an appeal from a Magistrate's judgment in a replevin suit by either party on giving bond in double the value of the property replevied. This Section of the Code has been construed in connection with Section 4928, Thompson-Shannon's Code authorizing suits *in forma pauperis* in all cases except actions for false imprisonment, malicious prosecution, slanderous words, and divorce suit brought by males. It was held that a defendant in replevin might appeal from a Magistrate's judgment upon the pauper's oath notwithstanding the provisions of Thompson-Shannon's Code, Section 5153, an appeal being in the nature of an action and all actions except those excluded by

Section 4928, being permitted on the pauper's oath. *Scott* v. *Brandon,* 125 Tenn., 314. So we think that the provision of the Act before us should be read along with Section 4928, Thompson-Shannon's Code, and the owner of a dog, the destruction of which is ordered in proceedings before a Justice of the Peace, may have his appeal upon taking the oath prescribed for poor persons.

*(16)* We see no constitutional impropriety in the provision of Section 8 of the Act requiring the County Trustee to appoint two disinterested citizens to appraise damage to stock, fowls or animals injured by a dog, for which damage it is proposed to make claim for payment out of the funds accruing under the Statute. We have many laws entrusting limited judicial functions to Boards, Commissions and other inferior tribunals. The decisions of such tribunals on justiciable questions are always reviewable by *certiorari* in the Circuit Court. *Staples* v. *Brown,* 113 Tenn., 639; *City of Nashville* v. *Martin,* decided February 18, 1928.

*(17)* We do not find any provision in the Act which we regard as beyond the scope of the title thereto contrary to the provisions of Section 17 of Article 2 of the Constitution.

*(18)* Much was said in argument as to the effect of this Statute on dogs owned in counties adjoining the four counties dealt with and coming across the borders, and as to the rights of the owners of such dogs living in adjoining counties. One of the cases before us is brought entirely by citizens of Wilson County. The other case is brought by citizens of Bedford County. All of these complainants, therefore, reside in counties to which the Act relates and they have no standing to ask the Court to consider the rights of those residing in adjoin-

ing counties. If the difficulties suggested have any substance, such things cannot be considered in these cases for these complainants are not adversely affected.

*(19)* Other criticisms of the Act are made identical with the criticisms made of Chapter 61 of the Acts of 1919, a general dog law covering the whole State later repealed the validity of which was declared in *State* v. *Anderson,* 144 Tenn., 564. Although this decision was made by a divided Court, the majority of the present Court regard the conclusions of *State* v. *Anderson,* as sound. The questions there raised must, therefore, be treated as settled and they will not be reopened.

The decree of the Chancellor in each of these cases will be affirmed and each bill will be dismissed with costs.

DISSENTING OPINION BY MR. JUSTICE COOK.

As stated in its caption, the object of Chapter 702, Private Acts of 1927, is to afford protection to the people and their property. To accomplish that laudable purpose the Legislature ignored express constitutional restraints by creating a fund from which to compensate owners of sheep killed by dogs, and for the benefit of persons bitten by rabid dogs within the exclusive section covered by the Counties of Bedford, Maury, Montgomery and Wilson.

Legislation that dissevers sheep growers and persons who may suffer from the bite of rabid dogs as is done by this Act, and favors a portion of them to the positive exclusion of others is contrary to the equal rights provisions of the Constitution.

The opinion of the Court sustaining the Act rests primarily upon the concept that when the Legislature selects a Section of the State and makes for it a partial law, the

Court must suppose a legislative reason for the arbitrary choice of the favored section.

The broad power inhering in the Legislature to classify subjects of legislation for the application of revenue laws and police regulations is unquestioned; and it is elementary that the Courts cannot declare Statutes unconstitutional as class legislation because the reason for the classification is a bad one, nor merely because the reason does not appear on the face of the Act. But these rules do not authorize the Courts to ignore palpably arbitrary classifications, and to ascribe to a challenged Act a basis for classification and a legislative reason for making it which the Act itself shows did not exist. The Legislature cannot arbitrarily create a class and thereby close the eyes of the Court to the fact that the classification is arbitrary. 6 R. C. L., par. 372, page 379.

It is apparent from an inspection of the Act that it embraces only a portion of those who exist in the State and are surrounded by precisely similar circumstances. The Legislature and the Courts are supposed to know what ordinary observation discloses to men. Common knowledge is open to the Court as well as the Legislature, and it is common knowledge that in agricultural pursuits, soil, topography, and climate, many counties of the State are similar to the four counties to which this law is confined. This being true, the Legislature was without power to select the four counties and legislate for their people to the exclusion of others in the State. *State* v. *Railroad,* 124 Tenn., 10; *Stratton* v. *Morris,* 89 Tenn. 534; *State* v. *Turnpike Co.,* 133 Tenn., 451.

Under Article 11, Section 8 of the Constitution, objects may be classified for the purpose of legislation, but the classification must rest upon some natural or substantial

difference and must include all who belong to the class. *Condon* v. *Maloney,* 108 Tenn., 92; *Ledgerwood* v. *Pitts,* 122 Tenn., 605; *State* v. *Cummings,* 141 Tenn., 318.

This Act presents no pretense of classification. It confers benefits upon all whose sheep are killed or injured by dogs within these counties, and upon all who may suffer from the bite of rabid dogs. These benefits are denied citizens of all the other counties of the State, and as drafted the Act makes it impossible for the other counties to ever come within the favored class. Nothing on the face of the Act marks the objects of its bounty as the peculiar subjects of legislation.

Special laws in the Private Acts from 1915 to 1927 cover 18,500 pages. Among these special laws are Acts that regulate the governmental affairs of counties and municipalities. Such Acts are held valid in *Prescott* v. *Duncan,* 126 Tenn., 140; *Redistricting Cases,* 111 Tenn., 234; *Bise* v. *Knox County,* 154 Tenn., 483.

Another class of statutes are held valid because made applicable to particular counties by reference to the Federal Census. These Acts are sustained upon the theory that the classification is reasonable because all the counties of the State may, when the required conditions occur, obtain the benefit of the law. *Cook* v. *State,* 90 Tenn., 407; *Sullivan* v. *State,* 136 Tenn., 194.

The relation between population and sheep raising is easily supposed. The industry requires open fields for pasture, and Acts to protect the industry in counties classified by population are valid. *Ponder* v. *State,* 141 Tenn., 481. Resorting to classification based on population, the Legislature of 1927 enacted Chapter 10 for Sumner County, Chapter 177 for Lincoln County, Chapter 607 for Haywood County, and Chapter 477 for Giles

County, to protect the sheep industry in those counties. And at the same session without resort to any mode selected Montgomery, Wilson, Maury, and Bedford Counties for the application of the partial law under Chapter 702. All these Acts deal with the same subject and those applicable to Sumner and Giles Counties, and the Act passed for Montgomery, Wilson, Maury and Bedford are in substance the same.

Under the rule declared in *Hall* v. *The State, supra,* the four counties mentioned in Chapter 702 might pass, by shift of population, into the classification of Sumner or Giles, and their residence would be the subjects of two classifications and the beneficiaries of two laws designed to accomplish the same purpose.

This last statement as a legal proposition may be unsound, but it shows that the Legislature did not intend to include within the area favored by Chapter 702 all who were entitled to the benefits of that Act. It is affirmative evidence of the fact that the Legislature did not pretend to classify, but that it selected arbitrarily. The Courts have consistently held unconstitutional special legislation which excludes the possibility of others, similarly situated, from ever coming within the favored class. *Pettit* v. *White County,* 152 Tenn., 660; *Woodard* v. *Brien,* 82 Tenn., 520; *Sutton* v. *State,* 96 Tenn., 696.

While the population standard of classification to support special legislation is artificial and unsound, it has the sanction of the Court in a long line of decisions, it makes a pretense toward recognizing the constitutional limitations upon legislative power, and is not so objectionable as a special law that requires a conclusion, in order to sustain it, that a legislative reason existed for the arbitrary choice of the favored section.

The main reason for this dissent is a disinclination to concur in the presumption that the Legislature had a reason for selecting the particular territory for the application of a partial law.