STATE *v.* ROBERT TULL.

*(July* 17, 1939.)

RODNEY, J., sitting.

*Caleb M. Wright,* Deputy Attorney-General, for the State.

*Daniel J. Layton, Jr.,* for the defendant.

Superior Court for Sussex County, Certiorari, No. 38, June Term, 1938.

RODNEY, J., delivering the opinion of the Court:

In the determination of the present question there are two principles that stand out distinctly and call for some consideration:

(a) The clear distinction between the action of the legislative will in requiring payment of money under the exercise of the police power on the one hand and the same kind of demand under the general power to tax for the raising of revenue on the other; and

(b) The nature of dogs as a subject of the exercise of the police power.

(a) There can be no doubt that the power of the Legislature to impose a tax under the police power for the purpose of regulation of the subject matter is co-existent with the legislative power to impose a tax for the raising of revenue, but is entirely distinct from the latter power and in no sense dependent upon it. *City of Carthage v. Rhodes,* 101 *Mo.* 175, 14 *S. W.* 181, 9 *L. R. A.* 352; *City of Paxton v. Fitzsimmons,* 253 *Ill.* 355, 97 *N. E.* 675, 39 *L. R. A. (N. S.)* 155; *State v. Anderson,* 144 *Tenn.* 564, 234 *S. W.* 768, 19 *A. L. R.* 180.

The defendant readily concedes the power of the Legislature to impose a regulatory tax under the police power, but denies that the present statute can be so construed, and this contention will presently be considered.

(b) Dogs have always been deemed a peculiarly appropriate subject of regulation under the police power. In dogs there is, at best, an imperfect and qualified nature of property differing materially from other domesticated animals, such as horses and cattle. The reason lies partly in the nature of dogs and their disposition to damage other animals and poultry, especially in the night time when identification is difficult, and partly in the danger to human

beings, either from being merely injured or in the possible transmission of a most serious malady.

For these reasons the Courts have almost uniformly *held* that it is an undoubted exercise of the police power to insure that every dog shall be listed and registered to a known owner and that the dog shall carry affixed upon its collar the means of identification.

It has been said that it is entirely within the power of the Legislature to prohibit the ownership of dogs at all and to provide any regulation which the legislative will may impose. *McGlone v. Womack*, 129 *Ky.* 274, 111 *S. W.* 688, 17 *L. R. A.* (*N. S.*) 855; *Fincher v. Collum*, 2 *Ga. App.* 740, 59 *S. E.* 22. See 49 *A. L. R.* 848.

In *Sentell v. New Orleans & C. R. Co.*, 166 *U. S.* 698, 17 *S. Ct.* 693, 696, 41 *L. Ed.* 1169, the Court said:

"It is purely within the discretion of the legislature to say how far dogs shall be recognized as property, and under what restrictions they shall be permitted * * *."

The defendant does not contend that there is not a clear legislative right to collect some money pursuant to the exercise of police power, nor does he deny that the regulation of dogs is a proper exercise of the police power. He does contend, however, that when the collection of money, even for licenses, is clearly for the purpose of collection of revenue and not primarily for regulation, that then the Statute is subject to constitutional limitations and must be general in scope and uniform in the territorial limits of the authority levying the tax. A proper consideration of this contention must include a review of the specific Statute, but before doing this there are a few general principles which should be adverted to:

(1) The fee imposed for the privilege of keeping a dog is usually considered but a license fee under the police

power and not a tax for revenue. 2 *Am. Jur., p.* 719, *Sec.* 33; *Paxton v. Fitzsimmons, supra;* 49 *A. L. R.* 848.

(2) Courts will enforce any reasonable legislative exercise of police power.

(3) A legislative exercise of police power will be enforced unless it is clearly arbitrary ànd the burden of proving such arbitrary nature is on him who so contends. *Darnell v. Shapard,* 156 *Tenn.* 544, 3 *S. W. 2d* 661.

A consideration of the present Statute regulating dogs is made more intelligible by a general review of the legislative history covering the subject matter. This review reveals a rather peculiar and intricate exhibition of legislative vacillations, but through them all there runs the chord of the possible damage done by dogs and the intention to limit the number of dogs. Geographically, the laws have, at various times, applied to New Castle County alone, *C.* 165, *Vol.* 4; to only four of the hundreds of New Castle County, *C.* 143, *Vol.* 5; to rural New Castle County, excluding Wilmington, *C.* 106, *Vol.* 11; to rural New Castle County and including Duck Creek Hundred, in Kent County, *C.* 229, *Vol.* 12; to Kent County, *C.* 61, *Vol.* 15; and portions of the Acts to the entire State, *C.* 250, *Vol.* 9.

Most of the Acts have partially indicated, by their title, the purpose of their enactment. Thus most of the Acts have been entitled *"An Act to prevent injury by dogs * * *"* or *"An Act for the protection of sheep."* The methods of collection of the tax have not been uniform. The duty has been cast both upon ordinary collectors of taxes and upon Road Commissioners, but in the latter case the proceeds were set aside as a "sheep fund for ——— Hundred", *C.* 106, *Vol.* 11. Ordinarily the proceeds of the tax were made available to owners of sheep who had sustained damage, and excess of proceeds of the tax have been used for roads

or schools. In one instance, *C*. 338, *Vol*. 9, the tax was made primarily for school purposes, but an immediate amendment, *C*. 457, *Vol*. 9, exempted one dog belonging to each inhabitant, and made the tax only on additional dogs. This would seem to intend the limitation of numbers of dogs rather than the collection of revenue.

The first Act regulating dogs seems to have been passed Feb. 4, 1811, *C*. 165, *Vol*. 4. Neither this Act nor the many succeeding ones need be critically examined, but we may pass to the Act of Mar. 5, 1867, *C*. 145, *Vol*. 13, which was in force when the present Act (or its predecessor) was passed.

The Act of March 5, 1867 was entitled *"An Act for the protection of sheep in New Castle County"* and applied solely to that part of New Castle County outside of Wilmington. The hundred assessors listed the dogs belonging to each owner but they could not include any dogs in any incorporated town or city. The hundred collectors were then required to collect from the owner fifty cents for the first male dog owned by him and one dollar for each additional male dog, and two dollars for each female dog. The money was turned over to the County Treasurer. There was then, and by amendment in *Vol*. 15, *c*. 380, provided a method whereby the owners of sheep or lambs killed by dogs should receive, at least, partial satisfaction from this fund.

This Act of March 5, 1867 seems to have had a direct intention to regulate the keeping of dogs and, to me, there is no indication that its primary intent was the raising of revenue. Clearly the qualified nature of property in dogs was shown and the intent to limit the number of dogs, for by *Sec*. 8 it was lawful for anyone to kill a dog that was not on the assessment list, and if the owner refused or neglected to pay the tax for an assessed dog for the period of ten days after demand, the collector could kill the dog.

A tax of fifty cents for the first male dog and one dollar for each additional one would seem to be regulatory in character, and except upon the ground of regulation and desire to limit the number of dogs, it would be difficult to understand the higher tax of two dollars on each female dog.

In 1925 there was passed *C*. 185, *Vol*. 34, *Laws of Delaware,* being the first law requiring the licensing of dogs, exclusively in Kent and Sussex Counties. It was passed in substantially the same form it bears today. By this Act the license was issued by the Board of Game and Fish Commissioners. It is quite probable that it was made applicable only to Kent and Sussex Counties because the regulatory Act hereinbefore considered, *C*. 145, *Vol*. 13, also found as *Secs*. 1184-1192 of *Revised Code* of 1915, was still in force in New Castle County, outside of Wilmington.

In 1927, by *Chapter* 165, *Vol*. 35, *Laws of Delaware,* the provisions of *Vol.* 34, *C*. 165 were made applicable throughout the State of Delaware, outside of the corporate limits of Wilmington, and the older law of March 5, 1867, applying solely to New Castle County, outside of Wilmington, was repealed. *Chapter* 165, *Vol.* 35 became effective insofar as New Castle County was concerned on July 1, 1927, and the Board of Game and Fish Commissioners was relieved from any liability for damages to live stock or poultry caused by dogs in New Castle County prior to July 1, 1927. Except for some amendment concerning the amount of licenses for kennel dogs the Acts of 1925 and 1927 are substantially the same as the present law.

██ I am of the opinion that there is no indicated intention that the purpose of the Act was the raising of revenue, but it seems clearly for the purpose of regulating dogs under the police power. Under *Sec*. 2866 the license tag must be affixed to the collar of the dog. *Sec*. 2867 pro-

hibits any dog without the license tag to be at large. Under *Sec.* 2870 a licensed dog only is made personal property for which the owner could maintain an action, and under *Sec.* 2871 any unlicensed dog entering any field is constituted a public nuisance, allowing the destruction of any such unlicensed dog without any responsibility for such act.

It is quite possible that the great advance in the production of poultry in Kent and Sussex Counties and in rural New Castle County had called for that protection formerly accorded sheep raising, for under the Act

"Any person, firm or stock company, who shall have live stock or fowl killed or injured by any dog shall be entitled to receive compensation therefor at the assessed value of such stock and the fair value of such fowl out of the funds derived from the sale of dog licenses." *Section* 2874.

By the Act all the proceeds of the sale of dog licenses must be expended in compensation to the owners of live stock or poultry killed or injured by dogs, in propagation of game and protection and conservation of wild life, or in the expenses of the Commission. It is quite immaterial that all of the proceeds of the licenses are not directly applied to the damage done by dogs. Revenue accruing under the police power need not be strictly confined in its expenditure to the precise object of the regulation, for under such circumstances the license or tax might, of necessity, be so small as to utterly defeat the regulation itself.

It is not for this Court to precisely inquire as to the reason for the exclusion of the City of Wilmington from the operation of the Act. Unless clearly arbitrary it is valid. It may well be that the Legislature had knowledge of the fact that in urban centers dogs had not the same freedom of action as in rural sections, or that in Wilmington special officers or dog catchers kept supervision and regulation well in hand; it may be that since the Fish and Game Commission were placed in charge of the regulatory measures that

uppermost in the legislative mind was the protection of game and wild life, and that the Legislature thought that this was not endangered by the dogs in Wilmington.

In *McQueen v. Kittitas County*, 115 *Wash.* 672, 198 *P.* 394, an Act licensing dogs and excepting from the Act cities of the first and second class was sustained; in *Darnell v. Shapard*, 156 *Tenn.* 544, 3 *S. W.* 2d 661, the Act regulating dogs applied to but four counties of the State; in *Nicchia v. People of the State of New York*, 254 *U. S.* 228, 41 *S. Ct.* 103, 65 *L. Ed.* 235, 13 *A. L. R.* 826, the Act licensing dogs only applied to cities over 800,000.

In 49 *A. L. R.* 847 is a comprehensive annotation on *"Constitutionality of Dog Laws."* Where the fee imposed by statute or ordinance is not a tax but a license fee imposed by virtue of the police power, the cases uniformly hold that such a statute or ordinance is not violative of a constitutional guaranty that all taxes shall be uniform and equal.

Because I think that the purpose of the Act is the regulation of the keeping of dogs and an exercise of the general police power of the State, so I think that the Constitutional provision, *Art. 8, Sec.* 1, having to do with taxation for revenue purposes, has no application, and the first exception must be denied.

2. The second exception must also be overruled. The Constitutional provision, *Art.* 8, *Sec.* 1, requires that taxes be "levied and collected under general laws." Under the treatment accorded the first exception I have concluded that the license fee required for dogs was a regulatory measure under the police power and not a tax for revenue. The conclusion as to the first exception disposes of the second.

3 & 4. By these two exceptions the defendant

contends the Statute violates the due process clause of the *Federal Constitution, U. S. C. A.* I think otherwise. In *Nicchia v. People of State of New York, supra,* it was *held* that a state statute regulating dogs under the police power is not violative of the due process clause. There it is said

"Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right." [254 *U. S.* 228, 41 *S. Ct.* 104, 65 *L. Ed.* 235, 13 *A. L. R.* 826.]

I am of the opinion that the Statute is a valid exercise of the police power of the State and a Constitutional exhibition of the legislative will. The exceptions are therefore overruled.