CITY OF BUCKHANNON *ex rel.* RUTH LOUDIN COCKERILL *v.* ROY B. REPPERT *et al.*

(No. 8431)

Submitted October 21, 1936. Decided November 24, 1936.

*Steptoe & Johnson, James M. Guiher, Oscar J. Andre* and *Myron B. Hymes,* for plaintiffs in error.

*J. M. N. Downes* and *J. D. Jennings,* for defendant in error.

HATCHER, PRESIDENT:

The plaintiff recovered a judgment against an officer, on his bond, for injuries which allegedly resulted from incidents connected with the killing of a dog.

Some of the evidence was conflicting. From plaintiff's evidence and that which does not conflict with hers, the following case is presented for our review. The defendant, a city policeman, received an order from his chief to "do away with" a certain dog, not plaintiff's, against which complaints of viciousness had been made to the police department. As the defendant approached the dog, it lunged at him in a threatening manner. Thereupon, from a distance of about four feet, he shot it with a revolver. The bullet was not fatal and the dog ran, with defendant in pursuit. The plaintiff's residence was nearby. Her husband came outside to investigate the shot and not seeing anyone, re-entered the house, leaving the door ajar or insecurely fastened. The dog outdistanced the defendant and sought haven through that door, passed one of plaintiff's children in the hall, and entered a room occupied by renters, where it maintained a belligerent attitude. It left a trail of blood on the floors of the hall and the room. The defendant traced the dog to and followed it through the open door into the house.

He first made an effort to lasso the dog which was ineffectual. The renters insisted that he get the dog out of their room some way; he replied that he would have to shoot it; the plaintiff's husband said not to shoot in the house but suggested no alternative; the defendant closed the door and killed the dog with two carefully placed revolver shots. He then removed the dog from the house and, returning, assisted in wiping up the blood.

Plaintiff saw the dog pass her child in the hall, saw and smelled the blood on the floor and heard the shots. She testified that all of those circumstances terrified and excited her to such an extent that within a few days she suffered the miscarriage of a six weeks' foetus; and that since then she has lost weight, has slept poorly, has been nervous and has had backache.

A city ordinance authorized the police to kill a vicious dog at any time found running at large within the city limits. This dog was at large. Evidence on the dog's disposition was contradictory; but we do not regard that contradiction as material in this case, since it was not incumbent on defendant to justify, as against plaintiff, the order of his chief. His "not to reason why," his but to execute that order.

Plaintiff took the position in the circuit court that the entry into her house and the killing of the dog therein by defendant were both unlawful and he should respond in damages for the alleged result of his conduct. She also proposes now that the manner in which he went about killing the dog, initially, was negligent. Since that theory was neither pleaded nor litigated in the circuit court, we cannot consider it here. Defendant contends that the dog's attack on him left no choice of place where he should commence the dog's destruction; that its entrance into plaintiff's house was unforeseen and happened through no fault of his; that such entrance created an emergency and it was his duty, whether invited or not, to get the dog out of the house, and in doing so, he was careful and used the only means practicable.

Since Magna Charta, a man's home has been his castle,

but a castle gate is no bar to lawful authority. It is lawful for an officer in fresh pursuit of an escaping criminal even to force the door of a stranger, if the officer has reason to believe the criminal is within. *Brooks* v. *Commonwealth*, 61 Pa. 352, 10 Am. Dec. 645; *Commonwealth* v. *Tobin*, 108 Mass. 426, 11 Am. Rep. 375; 4 Am. Jur. subject Arrest, secs. 86 and 87. We are cited no case with facts like the instant one; but we see no difference in principle between this case and that of the fleeing criminal. Here, it was clearly defendant's duty to enter and remove the dog from the house. In the manner of doing so, he had a reasonable discretion. Plaintiff's husband had no more right to control that discretion within the house than without it. His bare request not to shoot in the house was of no moment against the apparent necessity of defendant's doing so.

The judgment is reversed.

*Reversed.*

KENNA, JUDGE, concurring:

This is a case of first impression in this state. The dog is a very important subject and the legal principles concerning him deserve the fullest consideration. These are my reasons for writing somewhat at length upon a subject that to many may seem trivial.

I would not base the decision of this case upon justification of the defendant's conduct by any order that he may have received from his immediate superior, the chief of police, because I believe that if the defendant was exceeding his lawful authority the orders of his superior did not protect him from civil responsibility for his own acts and would likely go no further than to furnish evidence of lack of malice on defendant's part. Neither would I base the decision upon an analogy of the authority of the defendant's conduct with that of an arresting officer, because it is my belief that the two things are fundamentally different in ways that are made plain by many decided cases.

The City of Buckhannon had an ordinance that made

lawful the summary destruction of any vicious dog found running at large within the corporate limits of that town. Speaking generally, dogs, under modern law, are regarded as property, but the obvious necessity of protecting the public from rabid, vicious and otherwise dangerous dogs makes them a class of property that must be held subject to this necessity and liable to very rigid regulation. Because of this, ordinances and statutes authorizing the summary destruction of dogs not kept in accordance with their terms have generally been upheld. *State* v. *City of Topeka,* 36 Kan. 76, 12 P. 310, 59 Am. Rep. 529; *Julienne* v. *Mayor, etc., of Jackson,* 69 Miss. 34, 10 So. 43, 30 Am. St. Rep. 526; *Jenkins* v. *Ballantyne,* 8 Utah 245, 30 P. 760, 16 L. R. A. 689; *Nehr* v. *State,* 35 Neb. 638, 53 N. W. 589, 17 L. R. A. 771; *Fox* v. *Mohawk & Hudson River Humane Society,* 165 N. Y. 517, 59 N. E. 353, 51 L. R. A. 681, 80 Am. St. Rep. 767; *McDerment* v. *Taft,* 83 Vt. 249, 75 A. 276, 138 Am. St. Rep. 1083; *Thurston* v. *Carter,* 112 Me. 361, 92 A. 295, L. R. A. 1915-C, 359, Ann. Cas. 1917A, 389; *Darnell* v. *Shapard* and *Graves* v. *Thorne,* 156 Tenn. 544, 3 S. W. (2d) 661. In fact, it may be doubted that statutory authority is necessary to warrant the killing of a vicious dog found running at large. It seems to be fairly well settled that they may be regarded as common enemies and nuisances and as such subject to be summarily destroyed independently of express authority. *Brown* v. *Carpenter,* 26 Vt. 638, 62 Am. Dec. 603. See also the note to *Marsh* v. *Jones,* (21 Vt. 378) 52 Am. Dec. 67, and note to *Hubbard* v. *Preston* (90 Mich. 221, 51 N. W. 209), 15 L. R. A. 249.

The Massachusetts cases deal with the question of whether an officer or a private citizen who enters upon the premises of another without permission in order to enforce such an enactment is to be regarded as a trespasser. In *Bishop* v. *Fahay* (1860), 15 Gray (81 Mass.) 61, it was held that the provisions of a statute giving "any person" the right to kill a dog "going at large" and not registered and collared as provided in the statute did not protect a private citizen who entered upon the premises of another and there killed a dog, but that he

was a trespasser and liable as such. In *Kerr* v. *Seaver* (1865), 11 Allen (93 Mass.) 151, the same rule was laid down under a similar statute with reference to a private person who entered without express or implied consent upon the premises of another for the purpose of killing a dog. In *Blair* and *Hutchinson* and *Smith* v. *Forehand* (1868), 100 Mass. 136, 137, 97 Am. Dec. 82, 1 Am. Rep. 94, it was held that an officer armed with a general warrant to kill dogs kept in violation of the statute was justified in entering the house of the owner of the dog for the purpose of killing it. This case states that no particular significance is to be attached to the warrant as authority, and that it simply constituted an appointment of the officer to act under the statute. The case discusses several Massachusetts statutes and decided cases and distinguishes between the rights of an officer and those of a private citizen in the premises. In *Cozzens* v. *Nason* (1872), 109 Mass. 275, it was held that under a similar statute, a constable had no right to enter upon the premises of a third person for the purpose of destroying a dog. There is no question of a warrant involved in this case. In *Moorewood* v. *Wakefield* (1882), 133 Mass. 240, it was stated that under the terms of a statute providing that "any person may, and every police officer and constable shall, kill or cause to be killed all such dogs, whenever and wherever found," the true meaning of the statute was that any person might kill an unlicensed or uncollared dog, whenever or wherever found providing he could do so without committing trespass, and that every police officer and constable should kill such dog, whenever or wherever found. There is no discussion of the distinction that the case seems to make between the authority of an officer and that of a private citizen. In *Moore* v. *Mills* (1906), 191 Mass. 56, 77 N. E. 638, it was held that the defendant, evidently a private citizen, was justified in killing the dog of the plaintiff which was not registered as required by law, although the plaintiff *bona fide* believed that his dog was registered. In the opinion, the court says that the defendant was justified in killing the dog if he did so without com-

mitting a trespass, although the question of trespass does not seem to have been raised in the case.

As is stated in the principal opinion, however, the testimony contained in this record is in conflict on the question of whether or not the dog that the defendant killed was in fact vicious. Since the verdict was for the plaintiff, upon conflicting proof, in this court, we must take the plaintiff's side of that question and treat the case here as though it had been established that the dog was not habitually vicious.

It is therefore necessary for us to conclude that the defendant was not justified in shooting the Slidell dog upon the plaintiff's premises upon the theory that it was a vicious dog.

That a person has the right to kill a dog in order to protect himself from bodily harm cannot be doubted. As simple as is this proposition and as undoubted sound sense as it contains, it is difficult to discover decided cases that sustain it exactly. *Nehr* v. *State*, 35 Neb. 638, 53 N. W. 589, 17 L. R. A. 771, is a case in which the defendant was prosecuted for killing a dog which the proof showed had made a demonstration that convinced the defendant that the dog was about to bite him. Nevertheless, the court seems to base its finding in favor of the defendant upon the fact that the dog was vicious and running at large and as such constituted a nuisance. The cases that are cited in texts as sustaining the proposition that a man may kill a dog not shown to be habitually vicious in order to protect himself, often do not do so. Those who may be interested in the legal lore with reference to dogs will do well to run down the cases annotated in connection with the case of *Graham* v. *Smith* (100 Ga. 434, 28 S. E. 225, 62 Am. St. Rep. 323), 40 L. R. A. 503. A large part of this annotation deals with the right to kill dogs, as do the annotations to *Hubbard* v. *Preston* (90 Mich. 221, 51 N. W. 209), 15 L. R. A. 249, 30 Am. St. Rep. 426, and *State* v. *Clifton* (152 N. C. 800, 67 S. E. 751), 28 L. R. A. (N. S.) 673.

But surely nothing need be said and no authority need be cited for the justification of killing any kind of an-

imal in protection of human beings or human life. It has probably been justifiably done since the human instinct of self-preservation was first translated into action. In the case of a dog, even an appellate court approaches the subject with a realization that it involves the deep affections of many people. From the poorest child to the richest sportsman, our people love dogs and the best way to describe loyalty in man is by using the dog for comparison. At the same time, we must be mindful that there are many highly dangerous dogs and that, in the case of any dog, the bodily harm that he may do is not to be measured solely by the violence of his threatened attack. The possibility of terrible suffering and death as a result of a dog's bite, and the almost certainty of a post mortem examination of the dog or the expensive and painful prophylactic treatment of the person bitten, or both, render the prospect of an attack by even a small dog an extremely disagreeable and serious matter. Some of the books refer to the right of a man to defend himself against the attack of a dog or other animal as "self-defense." While it is perfectly apparent why this phrase should appeal to those considering the matter, the confusion that may result from its use in this connection is just as apparent. The use of the phrase here indicates that likelihoods and consequences in a man's defense against the attack of an animal must be weighed with something like the same consideration that exists in the case of an attack by a human being. Certainly, this is not so. A man threatened with attack by a dog, for example, is usually very foolish to retreat. It is safer for him to stand his ground, and he doesn't have to await the same serious apprehension before acting as does the man who is attacked by a man. There is so little discussion in the decided cases of this question, doubtless owing to the fact that the principles involved are too elemental to come frequently into appellate courts, that I do not care to hazard any definite opinion beyond that required, in my judgment, in this case. I would think, however, that any reasonable apprehension of being bitten by a dog, the person concerned being without blame,

18

would justify injuring the dog to the extent apparently necessary to protect one's self or to drive the dog away and would justify killing the dog if it *bona fide* seemed necessary. I do not think, however, that it is necessary to go into these matters.

It seems to me that here we have uncontradicted evidence on behalf of the defendant that gave him ample justification for shooting this dog in the first place. Complaints had been made to police headquarters that this dog was running at large and was vicious. The evening before it was killed, a woman, who lived in this neighborhood, had come to police headquarters and had requested, on account of fear of this dog, to have someone walk to her home with her. Defendant had escorted her home. On the day the dog was killed, between six and seven in the evening, Martin, Chief of Police, had told the defendant to be on the lookout for the dog on account of complaints concerning its viciousness, and had instructed him to make away with it. The dog weighed about thirty pounds and was half Chow, a breed thought by many to be characterized by bad disposition. These things were all known to the defendant when he started on his rounds on the evening that the matters complained of occurred. Naturally, he harbored some apprehension concerning the dog when he started out, and when he met it on Franklin Street, according to the defendant's uncontradicted testimony, this is what occurred: "He lunged out from the garden that is beside the Conley property, and when he lunged I suppose I gave way—his hair all the wrong way and growling—and nearly bit me, he bit at me. Q. How close did he get to you? A. About a foot or less than a foot. Q. What did you do? A. I squared myself around and he still held his ground, and I shot him. Q. What do you mean 'he still held his ground'? A. Well, after he made the lunge he didn't run until after I shot him." This testimony is uncontradicted and we see no reasonable basis upon which the jury could fail to give it significance.

It seems to me that under these circumstances the shooting of this dog in the first place was justified. If

the jury had reached this conclusion, then they were bound to believe that after the first shooting here was a good size dog that would, without cause, attack a man, in an ugly mood and with a wound that would undoubtedly aggravate its bad temper. Supposing that Reppert was justified in wounding this dog in the first instance, what was he to do when he discovered that a dog which had unprovokedly attacked him and which it had been necessary for him to wound, was running at large and had actually invaded the home of a citizen, where, as he had a right to believe and as it turned out, there were women and children? I trust that I fully realize the proper sensitiveness of our law to anything like an invasion of the home or a violation of privacy. The roots of our happiness are imbedded deeply in these principles. And yet acts done by public officers under color of their office and by private citizens through real, or even apparent, necessity, although they may be acts that would usually constitute trespass, are not always so regarded. It is hardly necessary to cite authorities upon these rudiments of the law, but an interesting annotation will be found at the end of the case of *Ploof* v. *Putnam* (81 Vt. 471, 71 A. 188, 20 L. R. A. [N. S.] 152, 130 Am. St. Rep. 1072), 15 Ann. Cas. 1151. There could be considerable elaboration of this discussion were there time and space. I doubt that this record is in such shape as that the necessity for the defendant to enter upon the premises of the plaintiff and there to shoot this dog can, as a matter of law, be said to have been shown. That necessity would depend upon many circumstances, the existence of which, as well as the inferences and conclusions to be drawn from them, are properly for jury determination. Then, too, if the necessity existed, it would excuse the conduct of the defendant only to the extent necessary to meet that necessity under all the circumstances. If his conduct went beyond the necessities, he could make himself a trespasser *ab initio* even though his original entry was justified.

In my opinion, the instructions of the trial court were wrong because they base the plaintiff's case solely on

the ground of trespass, and tell the jury, at plaintiff's instance and over defendants' objection, that that question is to be decided by it according to whether the defendant had the express or implied permission of the plaintiff to enter the premises. I think this ignores elements that the defendant had a right to have considered, namely, in the first place, whether he first shot the dog under circumstances that justified that shooting, and second, whether, after the dog was shot, the circumstances were such as to justify his entry of plaintiff's premises and what he did while there without plaintiff's permission. Another thing about the instructions of the court given for the plaintiff in this case that it seems to me may have misled the jury is that they relate the permission of the plaintiff to the time of the actual entry of the defendant upon the plaintiff's premises. This, of course, is not the law. If the defendant had entered the plaintiff's premises in a manner that made him a technical wrongdoer and a trespasser at that moment, nevertheless, by conduct or words, the plaintiff might thereafter have forgiven the trespass and have constituted the defendant an invitee. It seems to me that the court's instructions ignore this possibility and failed to give the jury sufficient latitude to find from the circumstances that the plaintiff's husband, no matter what may have been the defendant's original technical wrong in coming upon the premises, by words and by conduct approved his presence. Certainly, the defendant was not told to leave, and certainly, the only remonstrance that the plaintiff's husband made was in the first place for him not to shoot toward the bathroom for fear he might hit someone in the bathroom, and in the second place, the request not to shoot at all. It is entirely likely that, since the request not to shoot toward the bathroom was obviously based upon the chance of hitting some person in the house, the defendant took it as an implied permission to shoot if he could be certain that he would not strike anybody in the house. The plaintiff's admonition not to shoot at all could have been interpreted in the same way. Certainly, there is no claim that the defendant was ap-

prised of Mrs. Cockerill's delicate condition, and it is certain that he had no opportunity to regulate his conduct while on the premises with the fact of her condition in view. There may be a distinction between mere acquiescence in the presence upon one's premises of a trespasser and the giving of implied consent to that presence that would prevent a person from being a trespasser. As a usual thing, of course, a landowner does not have to protest the presence of a person making a wrongful entry in order to be able to treat the person as a trespasser. But circumstances alter cases, and what might be considered implied consent under stress and excitement, might not be so considered where, from the circumstances, more formality would be expected.

These are the considerations that prompt me to believe this case should be reversed and re-tried to a jury.