No. 14-0757 - <u>State of West Virginia v. Michael Blatt and Kim Blatt</u>

**FILED**

**June 16, 2015**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, concurring, in part, and dissenting, in part:

Apparently, from the majority's coign of vantage, the citizens of this State do not deserve the same protection from vicious or dangerous dogs that is enjoyed by cows, goats, pigs, and sheep.[1] Once again, the majority grants clemency to a dog that the lower court found to be vicious and dangerous. As I explained in *Robinson v. City of Bluefield*, 234 W.Va. 209, 764 S.E.2d 740 (2014), "not all dogs are like the beloved Lassie." *Id.* at __, 764 S.E.2d at 748 (Loughry, J., dissenting). I have very fond memories of my childhood companion and faithful dog, "Bozo,"[2] and understand that pets often become members of one's family. Such feelings and emotions, however, should not prevent the members of this Court from considering the facts of this case in an objective fashion rather than under the penumbra of sentiments attached to their own pets. As discussed more fully below, the dog in *Robinson* was involved in an incident within months of the majority's decision in that matter, which only serves to heighten my already grave concerns as to the potential serious and adverse consequences of the majority's decision in the case at bar.

---

[1] *See* W.Va. Code § 19-20-16 (2007) ("A person may kill a dog that he may see chasing, worrying, wounding or killing any sheep, lambs, goats, kids, calves, cattle, swine, show or breeding rabbits, horses, colts or poultry outside of the enclosure of the owner of the dog, unless the chasing or worrying be done by the direction of the owner of the sheep, lambs, goats, kids, calves, cattle, swine, show or breeding rabbits or horses and colts or poultry.").

[2] *See Robinson*, 234 W.Va. at ___, 764 S.E.2d at 749 (Loughry, J., dissenting).

1

Unlike the majority, my love of animals does not blind me to the lamentable reality that some dogs are dangerous, vicious, and inflict serious injuries–and even death–upon innocent victims. Sadly, case law is replete with incidents of vicious and/or deadly dog attacks. *See Bowden v. Monroe Cnty. Com'n,* 232 W.Va. 47, 750 S.E.2d 263 (2013) (setting aside dismissal of complaint brought by estate of victim who was maimed beyond recognition and ultimately died due to injuries sustained when he was attacked by several pit bulls while taking walk); *Atkins v. Conley*, 202 W.Va. 457, 504 S.E.2d 920 (1998) (involving personal injury action brought by parents of two-year-old child who incurred multiple injuries and permanent facial scarring inflicted by dog); *see also Cowan v. Carillo*, 771 S.E.2d 86 (Ga. App. 2015) (addressing action for damages arising out of injuries sustained by two children who were taken to hospital after they were bitten by pit bull that escaped owner's apartment after guest failed to properly shut apartment's front door); *City of Kenner v. Parker*, 918 So.2d 479 (La. App. 5 Cir. 2005) (affirming destruction of pit bull that bit six-year-old girl who required over one hundred sutures to reconstruct her forehead and finding that evidence was sufficient to establish that pit bull was dangerous and vicious even though owner testified that dog had never bitten anyone previously); *Sawh v. City of Lino Lakes*, 823 N.W.2d 627 (Minn. 2012) (finding substantial evidence supported finding that dog was unprovoked when it bit victim in third incident, so as to support city's order for destruction of dog under city ordinance); *State v. Moore*, Nos. 11AP-1116, 11AP-1117, 2013 WL 3968166 (Ohio App. 10 Dist. Aug. 1, 2013) (affirming conviction on two counts of

2

failure to confine vicious dog where appellant's pit bull mauled two different victims in separate incidents); *State v. Collins*, 763 S.E.2d 22 (S.C. 2014) (holding trial court's admission of pre-autopsy photographs of victim, ten-year-old boy who died after being severely mauled by dogs, was not abuse of discretion); *King v. Foht*, No. W2013-00518-COA-R3-CV, 2013 WL 5310436 (Tenn. Ct. App. Aug. 13, 2013) (reversing summary judgment granted in favor of owners of residential rental property in personal injury action brought on behalf of eight-year-old child attacked and injured by pit bull dog); *Watson v. State*, 337 S.W.3d 347 (Tex. App. 2011) (affirming conviction for offense of attack by dog resulting in death where seven-year-old boy was mauled to death by dogs).

As in *Robinson*, the majority once again disregards or diminishes the severity of the injuries inflicted in the current matter—this time by "Tinkerbell," a dog[3] that bit an eight-year-old child in the face in an unprovoked attack. The petitioners, Michael and Kim Blatt, who owned the dog, were charged with the misdemeanor offense of owning or harboring a dog they knew to be dangerous, vicious, or in the habit of biting other persons or animals.[4] During the criminal bench trial on those misdemeanor charges, the circuit court heard the testimony of the injured child's father, who stated that his son's "[u]pper lip was ripped, and his bottom lip was . . . ripped even worse" and that his daughter "came in

---

[3]The evidence presented during an evidentiary hearing below showed that Tinkerbell is a either a pit bull terrier or a pit bull terrier mix.

[4]*See infra* W.Va. Code § 19-20-20 (2007).

3

screaming because of what happened. She was terrified." The child's mother testified that she took their young son to the emergency room where "[t]hey had to hold him down and put needles in his face to sew it up. It was very traumatic." The record reflects that fourteen stitches were necessary to close the multiple lacerations inflicted by Tinkerbell on the face of this little boy. In further describing the aftermath of this frightening attack, the child's mother testified that her son's asthma worsened due to the stress caused by the trauma and that he slept upright in his bed "because he was afraid to hit his stitches on the pillows." Obviously, this testimonial evidence belies the euphemistic "nip" that was used by the Blatts' son to describe the incident, apparently at the suggestion of his parents. Their son ultimately conceded that the "nip" was a bite and that it was "pretty bad."[5]

More than one hundred years ago, the United States Supreme Court recognized this potential danger, explaining that dogs are subject to the state police power and "might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens." *Sentell v. New Orleans & Carrollton RR. Co.*, 166 U.S. 698, 704 (1897). Forty years later, those same precepts were echoed in *City of Buckhannon ex rel. Cockerill v. Reppert*, 118 W.Va. 10, 189 S.E. 585 (1937) (Kenna, J., concurring):

---

[5]In its further attempt to diminish the severity of the injury, the majority cites hospital records which state that the child's pain was minimal. However, other such records show that the child was administered pain medication in the emergency room and was given a prescription for pain medication to take at home.

4

> [U]nder modern law . . . the obvious necessity of protecting the public from . . . vicious, and otherwise dangerous dogs [means that dogs] must be held subject to . . . very rigid regulation. Because of this, ordinances and statutes authorizing the summary destruction of dogs not kept in accordance with their terms have generally been upheld.

*Id.*

In West Virginia, the Legislature has deemed it necessary to protect its citizenry, as well as animals within this state, from dangerous and vicious dogs. Under West Virginia Code § 19-20-16,[6] had Tinkerbell been chasing or "worrying" a cow or a pig instead of biting the face of a child, any person would have been legally permitted to wound or kill Tinkerbell. Morever, Tinkerbell could have been legally killed during its attack upon the child in question without the necessity of first proving that the dog is vicious or dangerous. W.Va. Code § 19-20-12(a) (2007).[7] The specific dog statute involved in the instant matter, West Virginia Code § 19-20-20, provides, in relevant part, that

---

[6]*See supra* note 1.

[7]West Virginia Code § 19-20-12(a) provides, in part, that

> except as otherwise authorized by law, any person who shall intentionally, knowingly or recklessly kill, injure, poison or in any other manner, cause the death or injury of any dog . . . is guilty of a misdemeanor . . . . *However, this section does not apply to a dog who is killed while attacking a person*, a companion animal or livestock.

*Id.* (emphasis added).

5

no person shall own, keep or harbor any dog known by him to be vicious, dangerous, or in the habit of biting or attacking other persons, whether or not such dog wears a tag or muzzle. Upon satisfactory proof before a circuit court or magistrate that such dog is vicious, dangerous, or in the habit of biting or attacking other persons or other dogs or animals, the judge may authorize the humane officer to cause such dog to be killed.

Any person who violates this statute can be prosecuted for a misdemeanor; hence, the prosecution of the Blatts in the case at bar. *See* W.Va. Code § 19-20-19 ("A person who violates any of the provisions of this article for which no specific penalty is prescribed is guilty of a misdemeanor. . . .").

In recent decisions of this Court, the majority has improperly applied West Virginia Code § 19-20-20. *See Robinson*, 234 W.Va. 209, 764 S.E.2d 740; *Durham v. Jenkins*, 229 W.Va. 669, 735 S.E.2d 266 (2012). In *Durham,* the majority found that "[f]or a magistrate or circuit court to obtain authority to order a dog killed, the magistrate or judge must first find, upon conducting a criminal proceeding, that a crime described in the first sentence of § 19-20-20 has been committed." *Id.* at 673, 735 S.E.2d at 270. In Chief Justice Workman's dissent in *Durham*, she aptly explained:

> The statute makes two distinct and independently operative provisions. First, the statute provides that it is unlawful for a person to keep or harbor a dog known by him to be vicious, dangerous, or in the habit of biting or attacking other persons. This is the criminal aspect of the statute and the specific "provision" of Section 20, [the] violation of which is subject to a criminal penalty pursuant to W.Va. Code § 19-20-19. Secondly, the statute authorizes the humane officer to kill

6

a vicious or dangerous dog upon proper finding by a circuit or magistrate court. This portion of the statute makes no reference whatsoever to the condition precedent created by the majority that before a dog may be euthanized under the statute, the owner must first be convicted of a crime or that such request may only be made in the course of a criminal proceeding. The plain language of the statute reveals that neither of the two provisions in the statute is dependent upon the other for operation. Even if a criminal conviction is not pursued or secured for whatever reason, including but not limited to a lack of knowledge as required by statute, there is nothing which prevents a court from ordering destruction of the dog upon a finding that it is vicious, dangerous, or in the habit of biting or attacking other persons.

[T]he majority overlooks the entire purpose of the statute—to protect the public from vicious dogs. . . . Moreover, it is entirely nonsensical that a vicious or dangerous dog may be free to remain a menace to the public if . . . [the] prosecuting attorney . . . realizes he cannot prove that the owner was aware of the dog's propensity for violence.

*Durham*, 229 W.Va. at 676-77, 735 S.E.2d at 273-74 (Workman, J., dissenting). Although I was not a member of the Court at the time *Durham* was issued, I wholeheartedly agree with Chief Justice Workman's sound reasoning. I also applaud the majority in the case *sub judice* for finally applying West Virginia Code § 19-20-20 in consonance with Chief Justice Workman's compelling dissent. Accordingly, I concur in the majority's holding in syllabus point three that a "magistrate or circuit court need not determine that a crime has been committed pusuant to W. Va. Code § 19-20-20 (1981) to proceed, at its discretion, to order the destruction of a dog pursuant to that statute" upon a determination that "there is satisfactory proof that the dog is dangerous, vicious, or in the habit of biting or attacking other persons or other dogs or animals."

7

Certainly, not every dog that bites a person or another animal is a dangerous or vicious dog. Although the majority cites to a plethora of definitions for the words "dangerous" and "vicious," it fails to recite the definition of "dangerous dog," which is "[a] dog legally classified as one whose behavior poses a threat to the safety of humans and other animals based on its actions, its breed, or the actions of its owner." *Black's Law Dictionary* 589 (10th ed. 2014). Likewise absent from the majority opinion is the definition of a "vicious animal," which is "[a]n animal that has shown itself to be dangerous to humans. . . . A vicious animal may be domestic, feral, or wild." *Black's Law Dictionary* 106 (10th ed. 2014).

Under these definitions, it becomes clear that in assessing the dangerousness or viciousness of a dog, the issue is whether a particular dog presents too great a risk of serious injury. In this regard, the bites of some dogs, such as herding dogs, which use their mouths to guide, rather than crush or rip, would not present the same risk of serious injury that the bites of other dogs present, whether due to their size, breed, disposition, past behavior, etc. Indeed, the determination of whether a particular dog is vicious or dangerous is an undeniably fact-specific process, and judicial decisions will necessarily turn on those facts.

In the instant matter, and in accordance with *Robinson* and West Virginia Code § 19-20-20, the circuit court held a hearing to determine whether there was satisfactory proof

8

that Tinkerbell is vicious or dangerous. The circuit court also took judicial notice of the evidence that was presented during the criminal bench trial on the criminal charges filed against the Blatts, which included the testimony of the assistant director of the local animal shelter. Testifying to his experience and training involving vicious and aggressive dogs, he described pit bulls as "more aggressive" than other breeds and being "harder" to handle. With regard to his personal experience with pit bulls, he explained how such dogs can be "generally fine one day" and the next day he has a "bite case[] against them[.]" Also testifying below was the animal control officer who responded to the incident in question. He testified that "[a] dog can be family-friendly and turn in an instant. We see it every single day that we're out there . . . ." This officer further testified that "typically if a dog is human-aggressive, then we put that animal down because . . . we don't want it biting somebody else."[8]

The circuit court considered this evidence, as well as the evidence presented during the destruction hearing, and entered its July 7, 2014, order in which it found that

> "Tinkerbell" did bite a child and caused severe injuries to the child; that the child was playing in an area where the child was permitted to be when he was attacked by "Tinkerbell," and the

---

[8]As Chief Justice Workman explained in her dissent in *Robinson,* "[e]ven the American Society for the Prevention of Cruelty to Animals ('the ASPCA'), the nation's leading animal welfare organization, recognizes that euthanasia may be appropriate where an animal has attacked a person." *Robinson*, 234 W.Va. at ___, 764 S.E.2d at 757 (Workman, J., dissenting).

> attack was unprovoked. . . . [and] that one unprovoked attack of a child is sufficient evidence of satisfactory proof that the dog is vicious, dangerous and in the habit of biting people.

The circuit court ordered that Tinkerbell be euthanized. I see no reason to substitute my judgment for that of the trial judge in this matter. Accordingly, I dissent from the majority opinion to the extent it does that very thing.

Because this matter was tried to the bench, our review is extremely deferential to the circuit judge. As we have previously explained,

> [f]ollowing a bench trial, the circuit court's findings, based on oral or documentary evidence, shall not be overturned unless clearly erroneous, and due regard shall be given to the opportunity of the circuit judge to evaluate the credibility of the witnesses. W.Va.R.Civ.P. 52(a). Under this standard, if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it, even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. We will disturb only those factual findings that strike us wrong with the "force of a five-week-old, unrefrigerated dead fish." *United States v. Markling*, 7 F.3d 1309, 1319 (7th Cir.1993), *cert. denied*, 514 U.S. 1010, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995).

*Brown v. Gobble*, 196 W.Va. 559, 563, 474 S.E.2d 489, 493 (1996). When applying this deferential standard, this Court cannot become the trier of fact and usurp the role of the circuit judge in making factual findings. Indeed, this Court further explained in *Brown* that

> [i]t is well settled in this jurisdiction that in a case tried without the aid of a jury, the trial court, and not the appellate court, is the judge of the weight of the evidence. Actually, in a nonjury trial, the trial judge has usually been regarded as a

10

surrogate for the jury, and his or her findings are accorded corresponding weight. Subject only to W.Va.R.Civ.P. 52(a)'s clearly erroneous standard, this standard precludes a reviewing court from reversing a finding of the trier of fact simply because the reviewing court would have decided the case differently. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). In fact, it is clear that the burden on an appellant attempting to show clear error is especially strong when the findings are primarily based upon oral testimony and the circuit court has viewed the demeanor and judged the credibility of the witnesses. *Nationwide Mut. Ins. Co. v. Conley*, 156 W.Va. 391, 395, 194 S.E.2d 170, 172 (1972).

*Brown*, 196 W.Va. at 565, 474 S.E.2d at 495.

Although the majority did not sit as the trier of fact, it manages to achieve its ultimate goal of saving Tinkerbell by considering the same evidence and, contrary to the long-standing precedent cited above, "decid[ing] the case differently." *Id.* In order to reach its desired result, the majority latches onto the circuit court's statement that pit bull terriers are presumptively dangerous, aggressive, and unpredictable, while simultaneously ignoring the other factual findings made by the circuit court, as discussed above. The majority apparently disregards the testimony of the assistant director of the local animal shelter and the human officer, each of whom described the training he received concerning aggressive dogs and, in particular, the aggressiveness and unpredictability of pit bulls.

Our memorandum decision issued in *Hardwick v. Town of Ceredo*, No. 11-0148, 2013 WL 149628, *1 (W.Va. Jan. 14, 2013), and upon which the circuit court relied, in part, presented a particularly sticky wicket for the majority. In *Hardwick*, we upheld the constitutionality of a municipal ordinance banning ownership of pit bull terriers. In doing so, we "adopt[ed] and incorporat[ed] the circuit court's well-reasoned findings and conclusions[,]" which included the following:

> Defendant's dogs are of the breed that is typically referred to generically as pit bull dogs which are aggressive by nature, have been known as attack animals with strong massive heads and jaws, and have been found to represent a public health hazard. The majority of jurisdictions have accepted the proposition that dogs of this type have a propensity to be aggressive and attack without provocation and it is well established that such dogs have gotten a lot of notoriety of being dangerous to public health and safety.

*Id.* at *1-2. Having adopted and incorporated the circuit court's "well-reasoned findings and conclusions" as our own, the majority is simply wrong to suggest that the circuit court was making baseless conclusions regarding pit bulls. Moreover, the circuit court is correct in its statement that other courts have reached similar conclusions. *See Burnett ex rel. Burnett v. Clarke*, No. 309373, 2013 WL 1010062, at *9 (Mich. Ct. App. Marh. 14, 2013) (Gleicher, J., dissenting and quoting *Hearn v. City of Overland Park*, 772 P.2d 758, 658 (Kan.1989)) ("[P]it bull dogs represent a unique public health hazard not presented by other breeds or mixes of dogs. Pit bull dogs possess both the capacity for extraordinarily savage behavior and physical capabilities in excess of those possessed by many other breeds of dogs.

12

Moreover, this capacity for uniquely vicious attacks is coupled with an unpredictable nature."); *Bess v. Bracken Cnty. Fiscal Court*, 210 S.W.3d 177, 182 (Ky. 2006) ("[T]he determination by the Bracken County Fiscal Court that pit bull terriers have 'inherently vicious and dangerous propensities' was certainly not unreasonable, given the evidence to support that finding."); *Garcia v. Village of Tijeras*, 767 P.2d 355, 359 (N.M. Ct. App. 1988) (noting "evidence establishing that the American Pit Bull Terrier breed possesses inherent characteristics of aggression, strength, viciousness and unpredictability not found in any other breeds of dog. . . . They have exceptionally strong bites, possibly twice the strength of bites of other dogs."); *Cleveland v. Johnson*,130 Ohio Misc.2d 17, 24 (Ohio Mun. 2005) ("Given the inherently dangerous nature of pit bulls and the proper and reasonable exercise of Cleveland's police powers in adopting the ordinances at issue, the defendant has not been denied his right of due process. . . [A] pit bull dog is clearly vicious by its nature. It would be unreasonable and against the public interest to first conduct individual hearings on the viciousness of pit bulls after an injury has been inflicted.").

The majority also excuses the dog in question because it had no history of bites prior to the victim in this case. Apparently hinting at a "one free bite rule," the majority insultingly suggests that "aggressive dog behaviors are *normal*, and even *desirable* by humans." Really? I am reasonably certain that victims of dog attacks or bites, including our subject victim and his family, would not find *aggressive* dog behaviors *desirable*. The

13

majority's further statement that it is "common knowledge that horses buck, cattle roam, cats stray and dogs bite," evinces an unnecessarily cavalier attitude toward a very serious matter. Is it not only offensive to dog bite victims, but also to the majority of dogs who never in their lifetimes bite or attack any other animal or human. Quite frankly, the majority goes too far by essentially suggesting that all dogs bite and folks should just expect it, accept it, and move on.

As in *Robinson*, the majority takes an errant path in this matter for the purpose of saving the life of a dog with seemingly little regard for the victim. In *Robinson*, the dog in question, named "Major," attacked an experienced humane officer, whose injuries required surgery and a hospitalization that approximated five days. Estella Robinson, the dog's owner, pled guilty to violating a municipal ordinance that prohibits a person from keeping or harboring "any dangerous animal known by him to be vicious, dangerous or in the habit of biting or attacking persons . . . ." *Robinson*, 234 W.Va. at __, 764 S.E.2d at 741. The municipal court issued an order directing that Major be euthanized, which order was upheld by the circuit court. On appeal to this Court, the majority reversed the lower courts' orders and spared Major's life. Reportedly, within months of the majority sparing Major's life, the dog became the subject of another complaint. The *Bluefield Daily Telegraph* recounted that a mail carrier registered a complaint with the Bluefield Police Department that he had been

14

chased by a pit bull as a woman ran after the dog, calling out: "Major[,] no . . . Major[,] no."[9] Because Ms. Robinson consented to the dog being euthanized, the potential criminal charges against Ms. Robinson were not pursued.[10]

Clearly, there can be well-mannered, non-aggressive pit bull terriers or pit bull terrier mixes that never attack or bite another animal or person during the dog's lifetime. Unfortunately, that simply is not the circumstance in the case at bar, as graphically reflected in the pictures of the injuries inflicted by Tinkerbell on this little eight-year-old boy.[11]  If a picture is worth a thousand words, then it is certainly unsurprising that the majority uses a thousand words to try to overcome those disturbing pictures.  Perhaps the humane officer said it best during the evidentiary hearing when he explained that a dog would be considered "human-aggressive" after one incident, posing the obvious question:  "[C]an you take a chance with another child . . . with the dog?"  The majority took another chance with the dog in *Robinson*, and we see how that ended.  My sincere hope is that the majority's decision regarding Tinkerbell does not lead to the death of a young child swinging on the swing sets

---

[9]*See* http://m.bdtonline.com/news/pit-bull-once-spared-by-high-court-euthanized/article_6a26d9dc-f073-11e4-9187-7fe3b99cdd7e.html?mode=jqm (last visited May 22, 2015).

[10]*See* note 9.

[11]These pictures were admitted into evidence below and are contained in the appendix record.

15

at a local park who, through no fault of her own, gets mauled and mutilated by this dog that the lower court determined to be vicious and dangerous.

For these reasons, I respectfully concur in the majority's holding that a magistrate or circuit court need not determine that a crime has been committed under West Virginia Code § 19-20-20 to proceed at its discretion to order the destruction of a dog under that statute. I dissent from the majority's decision to reverse the circuit court's July 7, 2014, order, which I believe is both legally and factually sound.

I am authorized to state that Chief Justice Workman joins in this separate opinion.